UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CORWIN TELTSCHIK, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 08-089 (HKK) |
| | : | |
| WILLIAMS & JENSEN PLLC, et al. | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**OPPOSITION OF DONALD F. MCGAHN TO PLAINTIFF'S MOTION TO
RECONSIDER ORDER GRANTING MCGAHN'S MOTION TO DISMISS**

Plaintiff originally filed this action in the U.S. District Court for the Southern

District of Texas against the Williams & Jensen law firm, Donald F. McGahn, and others.  The

court in Texas dismissed McGahn from the action last year but transferred the case to this Court

for further proceedings against the other defendants.  Many months went by, and the proceedings

before this Court unfolded, with no further mention of McGahn by Plaintiff.  Plaintiff made no

motion for reconsideration when the case was transferred.  He gave no inkling of an intention to

seek reconsideration at this Court's status conference on February 29, 2008.  Then, in May 2008,

President Bush nominated McGahn to serve as a Commissioner of the Federal Election

Commission ("FEC").  Only then did Plaintiff indicate his intention to move for reconsideration.

This Court should not countenance Plaintiff's conduct.  His long delay in moving

for reconsideration, and the apparently opportunistic timing of his motion, weigh heavily in favor

of leaving the prior order of dismissal undisturbed, as the Court is entitled to do.  Moreover, as

McGahn argued before the court in Texas, Plaintiff's allegations fail to state a claim against

McGahn.  Reconsideration of the Order of dismissal therefore would be futile.

Plaintiff's entire case rests on a fundamental misunderstanding of the law governing FEC civil enforcement actions and "conciliation agreements" settling those actions. Beginning in 1995, Plaintiff Corwin Teltschik served as treasurer of the Americans for a Republican Majority Political Action Committee ("ARMPAC"), a federal political committee registered with the FEC.  In 2005, the FEC initiated an investigation of ARMPAC, and ARMPAC retained McGahn to represent it before the FEC.  Taking his direction from ARMPAC officials, McGahn negotiated a conciliation agreement, pursuant to which ARMPAC settled the FEC case.  As ARMPAC's treasurer of record, Teltschik was named by the FEC solely in his official capacity.

Teltschik now complains that his name appears on the Conciliation Agreement. However, as the FEC itself has made abundantly clear, when it chooses to name a political committee's treasurer solely in his "official capacity" and not in his "personal capacity," the FEC is not alleging any wrongdoing by the *treasurer* but is instead acting against the *committee* itself. *See* Statement of Policy Regarding Treasurers Subject to Enforcement Proceedings, 70 Fed. Reg. 3, 4 (Jan. 3, 2005) ("FEC Policy Statement") (Tab A).  The FEC Policy Statement on the topic of treasurer liability is directly on point and is unequivocal:  A "finding against a treasurer in his or her official capacity makes clear … that the Commission is seeking relief against the committee, and would only entitle the Commission to obtain a civil penalty from the committee." *Id.* at 4-5.

As McGahn explained in his motion to dismiss before the court in Texas, Teltschik has not stated a claim against McGahn on which relief can be granted.  Considering the allegations in the Complaint, the documents incorporated in the Complaint, and the FEC Policy Statement and other matters of public record, each of the causes of action in the Complaint must be dismissed for the following reasons:

- <u>Libel</u> – Plaintiff's libel claim is barred by the statute of limitations because Teltschik had constructive notice of the Conciliation Agreement on the day that it was entered – July 19, 2006.  Separately, as the FEC Policy Statement makes clear, the Conciliation Agreement does not make any allegations against Teltschik personally.  Thus, there has been no libelous statement made about him.  Finally, even if there were a libelous statement about Teltschik, it was made in the course of a quasi-judicial proceeding, and it is therefore absolutely privileged.

- <u>Tortious Interference</u> – Plaintiff's tortious interference claim is barred by the statute of limitations.  Further, Teltschik has not alleged that McGahn's actions were made with an intent or conscious desire to interfere with Teltshick's existing or prospective contracts.  Nor has he alleged that his business suffered any actual injury.

- <u>Business Disparagement</u> – This claim, too, is barred by the statute of limitations.  Further, Teltschik has not alleged that McGahn acted with malice to disparage his business.  Separately, Teltschik does not allege that his business suffered any pecuniary loss.

- <u>Misappropriation of Name and Reputation</u> – The tort of misappropriation of name and reputation requires that a defendant unlawfully appropriate a plaintiff's name for *positive* purposes.  Teltschik does not make such an allegation.

- <u>Negligence/Breach of Fiduciary Duty</u> – As the FEC Policy Statement makes clear, Teltschik was not an individual respondent in the FEC proceeding against ARMPAC.  Thus, McGahn did not owe Teltschik a duty in his personal capacity.  Even if he had owed Teltschik a duty, McGahn satisfied that duty by negotiating the Conciliation Agreement.  Finally, the Conciliation Agreement has not caused Teltschik any injury.

- <u>Declaratory Judgment</u> – Plaintiff's claim for declaratory judgment asks the Court to make findings of fact, but it does not state a cause of action under any statute or common law.

**BACKGROUND**

A.    The FEC's Investigation Of ARMPAC.

ARMPAC was formed in 1994.  In May 1995, Teltschik was asked to become ARMPAC's treasurer.  (Compl. ¶¶ 1-2, 5.[1])  Teltschik officially became ARMPAC's treasurer on or about May 11, 1995, when ARMPAC filed a Third Statement of Organization for ARMPAC.  (*Id.* ¶ 7.)

In March 2005, ARMPAC retained McGahn, an attorney who specializes in campaign finance law and has experience practicing before the FEC, with respect to an already-ongoing FEC audit of ARMPAC's records.  On August 13, 2005, Citizens for Responsibility and Ethics in Washington ("CREW") filed a complaint (the "CREW Complaint") against ARMPAC at the FEC, based on the results of the FEC audit, alleging that ARMPAC had violated the Federal Election Campaign Act ("FECA").[2]  McGahn prepared ARMPAC's response to the CREW Complaint.  On September 6, 2005, defendant Barbara Bonfiglio, ARMPAC's assistant treasurer, called Teltschik to tell him about the CREW Complaint and to ask him to complete an FEC form designating McGahn as ARMPAC's counsel.  (*Id.* ¶ 15.)  Teltschik, however, refused to sign.  (*Id.*)  As a result, Bonfiglio, acting as assistant treasurer, executed and filed with the

---

[1]    We rely here on the Plaintiff's own allegations, assuming them to be true only for purposes of this Motion.  However, several of those allegations are contradicted by publicly available documents.  For example, in his Complaint, Plaintiff alleges that he "does not know how the FEC came to show his address as that of Williams & Jensen, as he never authorized any such designation to be filed with the FEC."  (Compl. ¶ 9.)  To the contrary, however, before the events at issue in this case occurred,  Plaintiff filed with the FEC at least two designation of counsel forms listing Williams & Jensen as ARMPAC's counsel, dated December 28, 1999, and December 19, 2002.  Indeed, the December 2002 designation is on letterhead with Teltschik's name and lists Williams & Jensen's address as Teltschik's address.  The designation of counsel forms are available on the FEC's website.

[2]    A copy of the CREW Complaint is attached at Tab B.

FEC a designation of counsel form designating McGahn as *ARMPAC's* counsel, which the FEC accepted.[3]

After ARMPAC answered the CREW Complaint, the FEC issued a "First General Counsel's Report," which made clear that the respondents to the CREW Complaint were ARMPAC and "Corwin Teltschik, *in his official capacity as treasurer*."[4]  (Emphasis added.) Subsequent pleadings in the civil enforcement action – called a "Matter Under Review" or "MUR" – also made clear that Teltschik was named in his official capacity only and that he did not face any personal liability.

McGahn negotiated with the FEC to resolve ARMPAC's potential liability. Ultimately, ARMPAC and the FEC agreed on a Conciliation Agreement, dated July 19, 2006, a copy of which is attached at Tab E.  The Conciliation Agreement again reflects that Teltschik is a respondent "only in his official capacity as treasurer."  (Conciliation Agreement, § IV, ¶ 2.)  The Agreement then states that ARMPAC – *but not Teltschik* – had committed certain, enumerated violations of FECA and its implementing regulations.  (*Id.* § V.)  Pursuant to the Conciliation Agreement, ARMPAC agreed to pay civil penalties and take other actions.  (*Id.* § VI.)

B.    The FEC Policy Statement

The FEC Policy Statement, titled "Statement of Policy Regarding Treasurers Subject to Enforcement Proceedings," was published in the Federal Register on January 3, 2005 – before the FEC began investigating the CREW Complaint.  *See* 70 Fed. Reg. 3 (Jan. 3, 2005). The FEC Policy Statement was intended "to clarify when, in the course of an enforcement proceeding … a treasurer is subject to Commission action in his or her official or personal

---

[3]    A copy of the Designation of Counsel form is attached at Tab C.

[4]    A copy of the FEC's First General Counsel's Report is attached at Tab D.

capacity, or both." *Id*. at 3. It explains that "when a complaint asserts sufficient allegations to warrant naming a political action committee as a respondent, the committee's current treasurer will also be named as a respondent in his or her official capacity." *Id.*

The FEC Policy Statement then describes the distinction that the FEC draws between treasurers operating in their official and individual capacity, one similar to the distinction drawn by the Supreme Court in *Kentucky v. Graham*, 473 U.S. 159 (1985): "[A] suit against an officer in her official capacity 'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent.'" FEC Policy Statement, 70 Fed. Reg. at 4 (quoting *Graham*, 473 U.S. at 165). "In other words, an official capacity proceeding '*is not a suit against the official* but rather is a suit against the official's office.'" FEC Policy Statement, 70 Fed. Reg. at 4 (quoting *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989)) (emphasis added).

The FEC makes clear that "in the typical enforcement matter the Commission expects that it will proceed against treasurers only in their official capacities," as it did in its investigation of ARMPAC. FEC Policy Statement, 70 Fed. Reg. at 3. It also "clarifies that findings by the Commission … *or the signing of a conciliation agreement* only concerns the treasurer in his or her capacity as a representative of the committee, not personally." *Id.* at 4. (emphasis added). Thus, a case against a treasurer in his official capacity entitles the FEC to collect civil penalties only from the political action committee – *not from the individual treasurer*. *See id.* at 4-5. Finally, the FEC explicitly states that by drawing this distinction, it intended to align its pleading conventions with the conventions of federal courts, so that when those courts are called upon to interpret an FEC action, they will recognize the familiar distinction. *Id.* This is just such a case.

The FEC Policy Statement leaves no doubt that when the FEC chose to name Teltschik as a respondent solely in his official capacity as treasurer, he personally was not being accused of any wrongdoing. He never faced any personal liability. In short, as a matter of law, the FEC case and the Conciliation Agreement that resolved it concerned ARMPAC, not Corwin Teltschik.

## **ARGUMENT**

Reconsideration of the Order dismissing McGahn from this case would be futile because Plaintiff has not pled a claim against McGahn for which relief can be granted. Although the Complaint purports to raise five causes of action, Plaintiff appears to plead seven separate claims: (1) libel (Fourth Cause of Action); (2) tortious interference with an existing contract or a prospective business relation (Fifth Cause of Action); (3) business disparagement (Fifth Cause of Action); (4) misappropriation of Plaintiff's name and reputation (Fourth Cause of Action); (5) negligence (Third Cause of Action); (6) breach of fiduciary duty (Second Cause of Action); and (7) declaratory judgment (First Cause of Action). The facts pled by Plaintiff would not support a claim under any of these theories.

A court has discretion to reconsider interlocutory orders, but it should only do so "as justice requires." *See Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 21 (D.D.C. 2007). That standard requires the court to determine "whether reconsideration is necessary under the relevant circumstances." *Judicial Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 122 (D.D.C. 2006). Here, it is clear that reconsideration is not necessary unless Plaintiff asserts a viable claim against McGahn. *Cf. James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile … if the proposed claim would not survive a motion to dismiss."); *Bennett v. United States*, 530 F. Supp. 2d 340, 341 n.1 (D.D.C.

2008) (under Fed. R. Civ. P. 60, court need not reconsider motion to dismiss "to the extent doing so would be a futile gesture in light of dismissal pursuant to 12(b)(1) and (6)").[5]

There is no reason to reconsider the Order dismissing McGahn because Plaintiff's claims against McGahn cannot survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Dismissal under the Federal Rules of Civil Procedure is appropriate when the plaintiff's complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss for failure to state a claim, a court accepts as true the well-pleaded allegations in the complaint, viewing them in a light most favorable to the plaintiff. *See Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). "Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion to dismiss, … a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Covad Commc'n v. Revonet*, -- F. Supp. 2d. --, 2008 WL 2096363, at * 4 (D.D.C. May 20, 2008) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007)). Documents referred to in the complaint or central to the plaintiff's claims are considered part of the pleadings and may be considered on a motion to dismiss. *See Hayes v. Chao*, 541 F. Supp. 2d 387, 388 (D.D.C. 2008). Furthermore, in ruling on a motion to dismiss, a court may refer to matters of public record. *See id*. None of Plaintiff's claims can survive this analysis.

---

[5]     Cases decided under Fed. R. Civ. P. 60 are instructive as to the standard to apply in determining whether justice requires reconsideration. Although the Texas Court's Order dismissing McGahn was not technically a final judgment, it did resolve all claims against McGahn in the case. The fact that the case continued against other defendants after McGahn was dismissed does not change the importance to McGahn of knowing that the claims against him have been resolved. *See Bennett*, 530 F. Supp. 2d at 341 ("'There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from judgment or order.'" (quoting *Ackermann v. United States*, 340 U.S. 193, 198 (1950)).

## I.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR LIBEL.

### A.    Plaintiff's Libel Claim Is Barred By The Statute Of Limitations.

Plaintiff failed to file a timely claim of libel.  The District of Columbia statute of limitations requires that an action for libel must be brought within one year after the date on which the cause of action accrues.  *See* D.C. Code Ann. § 12-301(4) (2007).  A libel cause of action accrues on the date of publication of the allegedly defamatory statement.  *See Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001).

The allegedly defamatory statements that serve as the basis for Plaintiff's claims were made in the Conciliation Agreement settling the FEC civil enforcement proceeding against ARMPAC, which was executed on July 19, 2006.  Thus, to fall within the one-year limitations period for libel actions, Plaintiff would have had to file his claim on or before July 19, 2007.  His Complaint was not filed until August 6, 2007, and it is therefore barred by the statute of limitations.

Plaintiff claims that he did not discover the existence of the Conciliation Agreement until November 2006, presumably in an effort to avoid the statute of limitations. (*E.g.,* Compl. ¶¶ 14, 18.)  This allegation is not sufficient to invoke the discovery rule, which only applies when "the relationship between the fact of injury and the alleged tortious conduct [is] obscure… *i.e.*, the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing."  *Mullin*, 785 A.2d at 298-99.  A claim may accrue before the plaintiff knows all relevant facts.  *See Johnson v. Long Beach Mortgage Loan Trust 2001-4*, 451 F. Supp. 2d 16, 42 (D.D.C. 2006).  Any "appreciable and actual harm flowing from the defendant's conduct is sufficient" to trigger the statute.  *See id.* (quoting *Bergen v. Rothschild*, 648 F. Supp. 582, 585 (D.D.C. 1986)).

"Knowledge of facts, and not knowledge of the legal significance of those facts, controls the time of accrual." *Id.*

In this case, Plaintiff reasonably should have known of any alleged defamation on the date of publication, as his Complaint acknowledges that he was aware of the FEC's audit of ARMPAC as early as January 2005, and he knew about the CREW Complaint and the FEC enforcement action no later than September 6, 2005, when Bonfiglio told him about it. (Compl. ¶¶ 11, 15.) Furthermore, FEC Conciliation Agreements are available as a matter of public record, *see FEC Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files*, 68 Fed.Reg. 70,427 (Dec. 18, 2003), and the Conciliation Agreement was the subject of a press release issued by the FEC[6] and extensive media coverage, including in Plaintiff's hometown newspaper.[7] Matters of public knowledge, including matters published in the news media, are not subject to the discovery rule. *See Mullin*, 785 A.2d at 299.[8]

---

[6]    *See* FEC Press Release, *ARMPAC Penalized $115,000 for Improper Financial Reporting* (July 20, 2006), available at http://www.fec.gov/press/press2006/20060720mur.html

[7]    *See, e.g.,* Michael Hedges, *PAC tied to Tom DeLay fined, shutting down; GOP Committee admits violating federal campaign finance rules*, Houston Chronicle, at A7 (July 21, 2006).

[8]    Plaintiff's failure to file suit in a timely manner is consistent with his general inaction in connection with these matters. Although he knew about the FEC's audit of ARMPAC in January 2005, he did not do anything to ensure that the audit was resolved in a way that Plaintiff deemed satisfactory. In September 2005, when he learned about the CREW Complaint and the FEC enforcement matter against the Committee for which he had served as treasurer, he again chose to stay uninvolved. He did not hire counsel, review pleadings, or, apparently, otherwise monitor the proceedings. Indeed, he waited more than a year after the entry of the Conciliation Agreement to file suit in Texas. Then, after McGahn was dismissed from the case, Plaintiff waited an additional six months – four of which were after the case was transferred to this Court – to move for reconsideration of the Order of dismissal.

**B.    Even Had Plaintiff Timely Filed, He Has Failed To State A Valid Libel Claim.**

To state a defamation claim, a plaintiff must identify a false and defamatory statement "concerning the plaintiff."  *Beeton v. District of Columbia*, 779 A.2d  918, 923 (D.C. 2001).  Whether a statement is capable of a defamatory meaning is a matter of law.  *See Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 313 (D.C. 2006).  The Conciliation Agreement was not, as a matter of law, directed at Plaintiff personally, but rather at ARMPAC. (Conciliation Agreement ¶ 2.)  It bears repeating that, under the FEC Policy Statement, when a committee treasurer is named as a respondent only in his official capacity, "the signing of a conciliation agreement *only concerns the treasurer in his or her capacity as a representative of the committee, not personally*."  FEC Policy Statement, 70 Fed. Reg. at 4 (emphasis added). Because the Conciliation Agreement applies to Plaintiff only in his official capacity, it cannot be libelous toward him personally.[9]

**C.    The Statements In The Conciliation Agreement Are Absolutely Privileged And May Not Form The Basis Of A Libel Claim.**

Statements made in the course of, or relating to, a quasi-judicial proceeding are absolutely privileged and may not serve as the basis for a libel action.  *See Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988).  "The determination about whether a communication is privileged is a question of law for the court."  *Id.*

The allegedly defamatory statements identified by Plaintiff were made in the context of an FEC civil enforcement action against ARMPAC.  The FEC civil enforcement action, brought by a federal government entity with quasi-judicial powers, *see* 2 U.S.C. §§ 437c-

---

[9]    Even if the statements in the Conciliation Agreement could libel Teltschik, McGahn bears no legal liability for these statements because McGahn did not intentionally make any statement about Teltschik.  McGahn simply used the caption that the FEC provided.

438; *Romero-Barcelo v. Acevedo-Vila*, 275 F. Supp. 2d 177, 184 n.1 (D.P.R. 2003), qualifies as a quasi-judicial proceeding for purposes of the privilege.  Communications related to that proceeding are covered by the privilege.  *Arneja*, 541 A.2d at 623.  These statements therefore may not form the basis for Plaintiff's libel claim.

## II.     PLAINTIFF HAS FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE.

### A.     Plaintiff's Claims For Tortious Interference, As Well As Business Disparagement, Are Barred By The Statute Of Limitations.

When allegedly defamatory statements form the basis of claims for tortious interference and business disparagement, the one-year statute of limitations for defamation actions applies.  Under District of Columbia law, "[w]hen a cause of action with no prescribed statue of limitations is 'intertwined' with one having a prescribed limitations period, District of Columbia courts apply the prescribed period."  *Browning v. Clinton*, 292 F.3d 235, 244 (D.C. Cir. 2002); *see also Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997).  "A claim is 'intertwined' with another when it is 'completely dependent' on or essentially the same as another, and cannot survive as a separate, independent cause of action."  *Johnson*, 451 F. Supp. 2d at 48.  Thus, in cases where a plaintiff's defamation claim is intertwined with other claims, District of Columbia courts apply the one-year statue of limitations applicable to defamation claims.  *See, e.g., Thomas v. News World Communications,* 681 F. Supp. 55, 72-73 (D.D.C. 1988) ("Plaintiffs' claim for emotional distress is thus completely dependent upon and 'intertwined' with their claims for libel, defamation, and assault and/or battery. As such, the emotional distress claim falls subject to the one-year limitations period specifically provided for those intentional torts"); *cf. Blodgett v. University Club*, 930 A.2d 210, 222 (D.C. 2007) ("where the plaintiff rests both his defamation and false light claims on the same allegations, as Blodgett has done here, the claims will be analyzed in the same manner").

Here, Plaintiff bases his tortious interference and disparagement claims on the allegedly defamatory statements in the FEC Conciliation Agreement. (Compl. at ¶ 51.) Plaintiff has not alleged any other basis for those claims; therefore, the one-year statute of limitations applies. As explained above, *see* Section I.A., Plaintiff failed to file his claims within the one-year period and the claims are therefore time-barred.

### B.    Plaintiff Has Failed To State A Claim Of Tortious Interference With An Existing Contract Or Prospective Business Relationships.

Under District of Columbia law, to state a claim of tortious interference with an existing contract, a plaintiff must allege: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach." *Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C. 2003) (citation omitted). "The elements of tortious interference with prospective business advantage mirror those of interference with contract. To prevail, however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction." *Id.* at 84 (citation omitted).

Plaintiff's Complaint fails to allege key elements of these claims. *First*, Plaintiff has not alleged – nor can he – that McGahn intentionally sought to procure breach of one of Plaintiff's existing contracts or to prevent the formation of a future contract. He has not alleged that McGahn had the intent or conscious desire to interfere with Plaintiff's business affairs. Such an intent is, however, an essential element of these causes of action. *See Paul v. Howard Univ.*, 754 A.2d 297, 308-09 (D.C. 2000).

*Second*, Plaintiff has not identified an existing contract that has been affected by an allegedly tortious act, nor has he identified any "reasonably probable" business relationship that was adversely affected by such an act. Relatedly, Plaintiff has not pled any actual harm or

damages he suffered as a result of any alleged tortious interference.  In the Complaint, he simply

states that the Defendants' conduct caused "damage to Plaintiff, for which he now sues.  It is to

be anticipated that these damages will continue into the future, so Plaintiff also sues for future

damages arising from this."  (Compl. ¶ 51.)  Conclusory statements about damages are not

sufficient to meet the elements of causation or actual damages.  *See Gov't Relations, Inc. v.

Howe*, No. Civ. A. 05-1081(CKK), 2007 WL 201264, at *9 (D.D.C. Jan. 24, 2007) (dismissing

tortious interference claim for, *inter alia*, failure to plead facts demonstrating that plaintiff

incurred damages); *Twombly,* 127 S.Ct. at 1964-65 (plaintiff's "[f]actual allegations must be

enough to raise a right to relief above the speculative level," and mere "formulaic recitation of

the elements of a cause of action will not do").

### III.    PLAINTIFF HAS FAILED TO STATE A VALID CLAIM FOR BUSINESS DISPARAGEMENT.

As noted above in Section II.A., Plaintiff has failed to file a timely claim for

business disparagement.  His claim is therefore barred by the statute of limitations.

Like a claim for tortious interference, an essential element of a claim for business

disparagement is intent on the part of the defendant to publish false and disparaging information.

*See Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155-56 (D.C. Cir. 1985) (business

disparagement requires proof that defendant acted with knowledge or reckless disregard of

falsity).  Plaintiff has not, and cannot, allege that McGahn negotiated the Conciliation Agreement

with the malicious intent to disparage Plaintiff's business.  Furthermore, Plaintiff has not alleged

pecuniary loss caused by the alleged disparagement.  Pecuniary loss to the plaintiff must always

be proved to establish a cause of action for business disparagement.  *See Art-Metal-U.S.A.*, 753

F.2d at 1155-56.  Without these allegations, Plaintiff's claim must fail.

IV.  **BECAUSE HE DOES NOT ALLEGE THAT DEFENDANTS APPROPRIATED HIS NAME FOR SOME POSITIVE PURPOSE, PLAINTIFF HAS NOT STATED A VALID CLAIM FOR MISAPPROPRIATION OF HIS NAME OR REPUTATION.**

The District of Columbia has adopted the Restatement (Second) of Torts approach to the invasion-of-privacy torts, including the tort of misappropriation of name.  *See Wolf v. Regardie,* 553 A.2d 1213, 1216-17 (D.C. 1989).  According to the Restatement:  "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."  Restatement (Second) of Torts, § 652C (1977) (emphasis added).  However,

> "[t]he value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity.  No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation.  It is *only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded*." Restatement (Second) of Torts § 652C, cmt. d (emphasis added).

Plaintiff has not explained how McGahn "misappropriated" his name or reputation.  At the time of the FEC civil enforcement proceeding and the execution of the Conciliation Agreement, Plaintiff served as the treasurer of ARMPAC.  It was therefore entirely appropriate for Plaintiff to be named, solely in his official capacity, in the FEC civil enforcement proceeding and Conciliation Agreement.  *See* FEC Policy Statement, 70 Fed.Reg. at 3.  Plaintiff has also made no allegation that McGahn used Plaintiff's name to obtain any advantage or benefit or to take advantage of the value associated with Plaintiff's name.  Because Plaintiff cannot claim that his name was used for such a positive purpose, his claim must fail.

- 15 -

## V.     PLAINTIFF HAS FAILED TO STATE A CLAIM FOR NEGLIGENCE.

As his third cause of action, Plaintiff alleges that McGahn was negligent in his performance as an attorney.  To state a valid claim of professional negligence, Plaintiff must allege (1) the existence of a duty owed by McGahn to him personally; (2) McGahn's breach of that duty; (3) that the breach proximately caused Plaintiff's injuries; and (4) that Plaintiff incurred damages.  *See Television Capital Corp. of Mobile v. Paxson Commc'ns Corp.*, 894 A.2d 461, 469 (D.C. 2006).  Plaintiff cannot show any of these essential elements.

*First*, as a matter of law, McGahn owed no legal duty to Plaintiff personally. Plaintiff, throughout his Complaint, *denies* entering into any attorney-client relationship with McGahn.  (Compl. ¶¶ 15, 23, 34.)  In fact, Plaintiff acknowledges that he never spoke to McGahn until after the FEC proceeding had concluded.  (*Id.* ¶ 23.)  District of Columbia law does not recognize a cause of action for professional negligence against an attorney asserted by someone who did not have an attorney-client relationship with that attorney.  *See Taylor v. Akin, Gump, Strauss, Hauer & Feld*, 859 A.2d 142, 147 (D.C. 2004).  Here, Plaintiff's allegations make clear that he rejected any type of attorney-client relationship with or reliance on McGahn. (*Id.* ¶ 15.)

Plaintiff also cannot maintain a negligence claim based on McGahn's representation of ARMPAC.  An attorney owes a duty of care only to his or her client, not to third parties who may have been damaged by the attorney's allegedly negligent misrepresentation of the client.  *See In re Estate of Brown*, 930 A.2d 249, 257 (D.C. 2007) (citations omitted) (noting "bedrock rule that the obligation of the attorney is to his client, and not to a third party").  McGahn was hired by ARMPAC to represent that committee in a civil enforcement action brought against it by the FEC.  Plaintiff was not an individual respondent in that proceeding.  Plaintiff's name appeared in the proceeding only insofar as he was named in his

official capacity as the committee's treasurer of record. The actual, and only, party-in-interest in the FEC proceeding, and the entity that faced sanctions for any violations of the federal election laws, was ARMPAC. McGahn, therefore, owed his duty as an attorney to his client, ARMPAC.

In his opposition to McGahn's motion to dismiss filed in Texas, Plaintiff argued that McGahn had a duty, as an attorney, to tell Plaintiff, also an attorney, that McGahn was *not* representing him. (Texas Opp., ¶ 33.) There is no legal support for such an argument.[10] McGahn never purported to represent Teltschik in his individual capacity. McGahn was retained by ARMPAC, he relied on and took his direction from ARMPAC officers, including its assistant treasurer, who filed the designation of counsel form informing the FEC that McGahn was representing ARMPAC, and he owed a duty only to ARMPAC. Nothing about that representation obligated McGahn to seek out Teltschik separately from ARMPAC and inform him that McGahn was not Teltschik's personal counsel. Indeed, by his own admission, Teltschik knew that McGahn was not his lawyer because Teltschik refused to sign a designation of counsel form. (Compl. ¶ 15.) Teltschik cannot now claim to have relied on McGahn as his personal attorney.

---

[10]    Plaintiff relied on *SMWNPF Holdings, Inc. v. Devore*, 165 F.3d 360 (5th Cir. 1999) to support his argument. However, even that case does not support Plaintiff's position. In *Devore*, the Fifth Circuit rejected the same argument that Plaintiff makes here and held that it was not reasonable for the plaintiff in that case to have assumed that the lawyers representing one of the parties in a property transaction also represented the plaintiff. The court therefore held that the attorneys did *not* owe a duty to advise the plaintiff that they did not represent it. *See id.* at 367. The court in that case based its decision on the relative sophistication of the parties involved. *See id.* The same logic applies here. Teltschik, as an attorney, certainly should have understood that McGahn's representation of ARMPAC was not the same as representing Teltschik personally, just as an attorney representing a corporation is not necessarily representing the company's officers or directors individually. Indeed, Teltschik certainly knew that he had never signed a retainer agreement with McGahn.

*Second*, even if McGahn owed Teltschik a duty, he did not breach that duty.  In order to show a breach, a plaintiff must demonstrate that an attorney's conduct violated the care that a reasonably prudent attorney would have shown.  *See Waldman v. Levine*, 544 A.2d 683, 688 (D.C. 1988) .  The Conciliation Agreement, the responsibility for which Plaintiff assigns to McGahn, states that ARMPAC committed certain violations of FECA, but it does not make any statements about Teltschik.  (Conciliation Agreement, § 5.)  Plaintiff has not alleged – and could not allege – that McGahn exercised anything less than the standard of care of a reasonably prudent attorney by negotiating an agreement that did *not* make any statements about wrongdoing by Teltschik.

*Third*, and finally, Plaintiff has not alleged that he suffered any recoverable damages as a result of any alleged negligence by McGahn.  He was not personally a party to the FEC's investigation of the CREW Complaint or to the Conciliation Agreement.  He was not fined by the FEC, nor was any other sanction imposed on him.  Indeed, the only "injury" that Plaintiff appears to allege is that the Conciliation Agreement somehow places his law license in jeopardy.  That injury, however, is entirely speculative; no disciplinary proceeding has been brought against Teltschik, nor is there any suggestion that one is imminent, despite the fact that the Conciliation Agreement was signed nearly *two years ago*.  Of course, the lack of a disciplinary proceeding is unsurprising given that the Conciliation Agreement includes no suggestion of any wrongdoing whatsoever by Teltschik personally.  Moreover, even Plaintiff admits that he "does not know if the State Bar of Texas will take any disciplinary action against him because of the findings in the Conciliation Agreement."  (Texas Opp., ¶ 42.)  "Actual, not speculative, damage is required to succeed on a legal malpractice claim."  *In re Estate of*

*Curseen v. Buchanan Ingersoll*, 890 A.2d 191, 194 n.3 (D.C. 2006) (citation omitted).  Plaintiff

has not alleged such injury, and his negligence claim is therefore fatally flawed.

## VI.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY.

In his second cause of action, Plaintiff alleges breach of a fiduciary duty owed to

him.  Specifically, he alleges that "defendants, all of whom are lawyers, undertook to and did

provide legal services to, for and on behalf of plaintiff….  As such, the Defendants owed

Plaintiff a fiduciary duty."[11]  (Compl. ¶ 41.)  This is simply a reiteration of Plaintiff's claim for

professional negligence, discussed above.  Plaintiff relies on the same conduct he relies on to

allege professional negligence to support his claim for breach of fiduciary duty.  (*Id.* ¶¶ 43, 46.)

Thus, the claim fails for the same reason:  McGahn did not owe Teltschik any duty, because

McGahn did not represent Teltschik.  *See Gov't of Rwanda v. Rwanda Working Group*, 227 F.

Supp. 2d 45, 64 (D.D.C. 2002) ("fiduciary relationship only exists when one party 'is under a

duty to act for or give advice for the benefit of another upon matters within the scope of the

relation'" (quoting Restatement (Second) Torts § 874 cmt. a (1977)).

Even had Plaintiff pleaded something beyond a negligence claim, he has not

stated a claim for breach of fiduciary duty.  District of Columbia law does not impose on

attorneys a fiduciary duty to third parties who are not their clients.  *See In re Estate of Brown*,

930 A.2d at 256.  Moreover, the Complaint contains no allegation that McGahn used his position

as an attorney representing ARMPAC for any improper gain or personal advantage.  Plaintiff's

---

[11]     It is unclear whether Plaintiff intends to assert this claim against McGahn.  Although paragraph 43 of the Complaint alleges that "the defendants" breached a fiduciary duty, the factual allegations in his second cause of action refer to actions taken by Bonfiglio and W&J, but not McGahn.

claim for breach of fiduciary duty is duplicative of his claim for professional negligence and should be dismissed.

## VII.   PLAINTIFF HAS FAILED TO STATE A JUSTICIABLE DECLARATORY JUDGMENT CLAIM.

Plaintiff seeks a series of declaratory judgments under the federal and Texas declaratory judgment statues.  *See* 28 U.S.C. § 2201; TEX. CODE ANN. § 37.001 *et seq*.  In light of the parties' agreement that District of Columbia law applies, the Texas declaratory judgment statute is not applicable here.  Thus, the requests for declaratory judgment should be resolved pursuant to federal law under the Declaratory Judgment Act, 28 U.S.C. § 2201.

Plaintiff has not alleged an "actual controversy" as required under the Declaratory Judgment Act.  28 U.S.C. § 2201.  Plaintiff's requests for declaratory judgments essentially amount to a request for a finding that, if any further action is ever brought against him by the FEC or any State Bar, he would not be held responsible.  He has not alleged any imminent action by either the FEC or by any State Bar.  Any declaration would be based on an entirely hypothetical set of facts; it would not resolve any specific and concrete legal dispute.  *See In re Iraq and Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 117 (D.D.C. 2007) ("dispute that is the subject of the request for a declaratory judgment must be definite and concrete … as distinguished from an opinion advising what the law would be upon a hypothetical state of facts").

Moreover, Plaintiff's request for a declaratory judgment asks the Court to make factual findings, rather than legal determinations.  Plaintiff seeks no declaratory judgment that would resolve any issue distinct from those involved in his other claims in this action.  In effect, Plaintiff, through his declaratory judgment claims, asks this Court to make findings of fact

related to those claims.  Because there is no separate need for any declaratory judgment, the

declaratory judgment claim should be dismissed.[12]

## CONCLUSION

For the foregoing reasons, the Court should deny as futile Plaintiff's motion to

reconsider the Southern District of Texas's dismissal of McGahn.

Respectfully submitted,

/s/ Joshua D. Wolson

Robert K. Kelner (DC Bar No. 466880)
Joshua D. Wolson (DC Bar No. 437082)
Scott F. Gast (DC Bar No. 483268)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave. N.W.
Washington, D.C. 20004
(202) 662-6000 (telephone)
(202) 662-6291 (facsimile)

*Attorneys for Defendant Donald F. McGahn*

Dated:  June 19, 2008

---

[12]    In Paragraph 35 of the Complaint, Plaintiff seeks a declaration that "the FEC had no
jurisdiction over him …." Even if Plaintiff's declaratory judgment action were proper, Plaintiff
cannot seek such relief by suing private parties. Instead, the FEC must be a party to any such
claim.

## CERTIFICATE OF FILING AND SERVICE

I, Joshua Wolson, hereby certify that on this 19th day of June, 2008, I caused a true and correct copy of the foregoing Memorandum and all accompanying attachments to be filed with the Court by e-mailing an electronic copy to the general mailbox for the United States District Court for the District of Columbia, dcd_cmecf@dcd.uscourts.gov.

I further certify that, on the same date, I caused true and correct copies to be served via electronic and first class mail upon the following:

J. Wyndal Gordon
The Law Office of J. Wyndal Gordon, P.A.
10 North Calvert Street, Suite 930
Baltimore, MD 21202
jwgaattys@aol.com

Reginald E. McKamie
1210 Antoine Drive, Suite 1000
Houston, TX 77055
mckamie@mckamie.com

L.T. "Butch" Bradt
5151 San Felipe, Suite 1950
Houston, TX 77056
lt_bradt@yahoo.com
*Counsel for Plaintiff Corwin Teltschik*

David B. Stratton
Jordan, Coyne & Safits, LLP
1100 Connecticut Ave. N.W.
Washington, DC 20036
d.stratton@jocs-law.com

William S. Helfand
Charles T. Jeremiah
Chamberlain, Hrdlicka, White, Williams & Martin
1200 Smith Street, Suite 1400
Houston, TX 77002
bill.helfand@chamberlainlaw.com
charles.jeremiah@chamberlainlaw.com

*Counsel for Defendants Williams & Jensen PLLC, Williams & Jensen PC,
Barbara Wixon Bonfiglio, Meredith G. Kelley, and Robert J. Martinez*

/s/ Joshua D. Wolson
Joshua D. Wolson

Tab A

# Rules and Regulations

**Federal Register**

Vol. 70, No. 1

Monday, January 3, 2005

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## FEDERAL ELECTION COMMISSION

### 11 CFR Part 111

[Notice 2004—20]

### Statement of Policy Regarding Treasurers Subject to Enforcement Proceedings

**AGENCY:** Federal Election Commission.

**ACTION:** Statement of policy.

**SUMMARY:** The Commission is issuing a Policy Statement to clarify when, in the course of an enforcement proceeding (known as a Matter Under Review or "MUR"), a treasurer is subject to Commission action in his or her official or personal capacity, or both. Under this policy, when the Commission investigates alleged violations of the Federal Election Campaign Act, as amended, the Presidential Election Campaign Fund Act, and the Presidential Primary Matching Payment Account Act (collectively "the Act" or "FECA") involving a political committee, the treasurer will typically be subject to Commission action only in his or her official capacity. However, when information indicates that a treasurer has knowingly and willfully violated a provision of the Act or regulations, or has recklessly failed to fulfill duties specifically imposed on treasurers by the Act, or has intentionally deprived himself or herself of the operative facts giving rise to the violation, the Commission will consider the treasurer to have acted in a personal capacity and make findings (and pursue conciliation) accordingly. This Policy Statement also addresses situations in which treasurers are subject to Commission action in both their official and personal capacities, and situations where successor treasurers are named.

The goal in adopting this policy is to clarify when a treasurer is subject to Commission action in a personal or official capacity, while at the same time preserving the Commission's ability to obtain an appropriate remedy that will satisfactorily resolve enforcement matters, or to seek relief in court, if necessary, against a live person. Importantly, the policy is grounded in the statutory obligations specifically imposed on treasurers and well-established legal distinctions between official and personal capacity proceedings.

**DATES:** December 16, 2004.

**FOR FURTHER INFORMATION CONTACT:** Peter G. Blumberg, Attorney, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:**

## I. Introduction

The Commission is modifying its current practices to specify more clearly when a treasurer is subject to a Commission enforcement proceeding in his or her "official" and/or "personal" capacity.[1] Specifically, when a complaint asserts sufficient allegations to warrant naming a political committee as a respondent, the committee's current treasurer will also be named as a respondent in his or her official capacity. In these circumstances, reason-to-believe and probable cause findings against the committee will also be accompanied by findings against the current treasurer in his or her official capacity. When the complaint asserts allegations that involve a past or present treasurer's violation of obligations that the Act or regulations impose specifically on treasurers, then that treasurer may, in the circumstances described below, be named in his or her personal capacity, and findings may be made against the treasurer in that capacity. Thus, in some matters the current treasurer could be named in both official and personal capacities. Maintaining the Commission's ability to pursue a treasurer as a respondent in either official or personal capacity allows the Commission discretion to fashion an appropriate remedy for violations of the Act.[2]

Notably, political committees are artificial entities that can act only through their agents, such as their treasurers, and often can be, by their very nature, ephemeral entities that may exist for all practical purposes for a limited period, such as during a single election cycle. Due to these characteristics, identifying a live person who is responsible for representing the committee in an enforcement action is particularly important. Without a live person to provide notice to and/or to attach liability to, the Commission may find itself at a significant disadvantage in protecting the public interest and in ensuring compliance with the laws it is responsible for enforcing. By virtue of their authority to disburse funds and file disclosure reports and to amend those reports, treasurers of committees are in the best position to carry out the requirements of a conciliation agreement such as paying a civil penalty, refunding or disgorging contributions, and amending reports.

The Act designates treasurers to play a unique role in a political committee; indeed, a treasurer is the only office a political committee is required to fill. 2 U.S.C. 432(a). Without a treasurer, committees cannot undertake the host of activities necessary to carry out their mission, including receiving and disbursing funds and publicly disclosing their finances in periodic reports filed with the Commission. *Id.*; 2 U.S.C. 434(a)(1). Given this statutory role, especially the authority to receive and disburse funds (*e.g.*, pay a civil penalty, refund improper contributions, disgorge ill-gotten funds) on behalf of the committee, designating the treasurer as the representative of the committee for purposes of compliance with the Act makes sense.

Although the Commission may be entitled to take action as to a treasurer in both an official and individual capacity, in the typical enforcement matter the Commission expects that it will proceed against treasurers only in their official capacities. However, the Commission will consider treasurers parties to enforcement proceedings in their personal capacities where information indicates that the treasurer

---

[1] The terms "official capacity" and "representative capacity" are generally interchangeable, as are the terms "personal capacity" and "individual capacity." *See McCarthy* v. *Azure*, 22 F.3d 351, 359 n.12 (1st Cir. 1994).

[2] In any scenario, the Commission will, of course, remain free to exercise its prosecutorial discretion not to pursue a respondent. For example, the Commission, in some cases, may decide not to

pursue a predecessor treasurer who technically has personal liability where the committee, through its current treasurer, has agreed to pay a sufficient civil penalty and to cease and desist from further violations of the Act.

knowingly and willfully violated an obligation that the Act or regulations specifically impose on treasurers or where the treasurer recklessly failed to fulfill the duties imposed by law, or where the treasurer has intentionally deprived himself or herself of the operative facts giving rise to the violation. In these circumstances, the Commission may decide to find reason to believe the treasurer has violated the Act in his or her personal capacity, as well as finding reason to believe the committee violated the Act.

This statement of policy is intended to provide clearer notice to respondents and the public as to the nature of the Commission's enforcement actions, improve the perception of fairness throughout the regulated community, and merge the Commission's treasurer designation into conceptually familiar legal principles for the federal judiciary.[3] The statement first surveys the law on the official/personal capacity distinction; next, addresses when the Commission will proceed as to treasurers in their official or personal capacity or both; and finally, resolves the reoccurring issues of successor treasurers and substitution.

The Commission's Proposed Statement of Policy Regarding Naming of Treasurers in Enforcement Matters was published in the January 28, 2004, **Federal Register.** 69 FR 4092 (January 28, 2004). One comment was received. The commenter stated that the Commission's effort to clarify its treasurer naming policy is welcome, but he made several recommendations for how the Commission could assist treasurers to better understand their potential personal liability, such as requiring separate notices in instances where a treasurer was named in his or her individual and official capacities, and by enacting the policy's proposals through a rulemaking, rather than a policy statement. The commenter's suggestions were considered, but in order to allow the Commission to retain flexibility in processing its cases, and because the policy statement combined with existing laws and Commission regulations provide sufficient notice to treasurers of their responsibilities, the suggested changes were not implemented.

## II. The Official/Personal Capacity Distinction

In the seminal case of *Kentucky* v. *Graham,* 473 U.S. 159 (1985), the United States Supreme Court discussed the distinction between official capacity and personal capacity suits. The Court determined that a suit against an officer in her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Id.* at 165. In other words, an official capacity proceeding "is not a suit against the official but rather is a suit against the official's office." *Will* v. *Mich. Dept. of State Police,* 491 U.S. 58, 71 (1989). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham,* 473 U.S. at 166. Therefore, in an official capacity suit, the plaintiff seeks a remedy from the entity, not the particular officer personally.

A "personal-capacity action is * * * against the individual defendant, rather than * * * the entity that employs him." *Id.* at 167'68. Since a "[p]ersonal-capacity suit[] seek[s] to impose personal liability upon" a particular individual, the individual is the true party in interest. *Id.* Liability lies with the particular officer personally, not with the officer's position. *See id.* at 166 n.11 ("Should the official die pending final resolution of a personal-capacity action, the plaintiff would have to pursue his action against the decedent's estate."); *see also Hafer* v. *Melo,* 502 U.S. 21, 27 (1991) ("officers sued in their personal capacity come to court as individuals").

The "distinction between claims aimed at a defendant in his individual as opposed to representative capacity can be found across the law." *McCarthy,* 22 F.3d at 360 (citing numerous Supreme Court, lower court, and state cases referencing differences between individual and official capacity claims in multiple fields of law).[4] The official capacity/individual capacity distinction also carries societal significance. As the *McCarthy* court explained:

The ubiquity of the [official capacity/individual capacity] distinction is a reflection of the reality that individuals in our complex society frequently act on behalf of other parties—a reality that often makes it unfair to credit or blame the actor, individually, for such acts. At the same time, the law strikes a wise balance by refusing automatically to saddle a principal with total responsibility for a representative's conduct, come what may, and by declining mechanically to limit an injured party's recourse to the principal alone, regardless of the circumstances.

*Id.*

## III. Treasurers in Their Official Capacity

Clearly indicating that the current treasurer is a party to an enforcement proceeding in his or her official capacity will improve the Commission's enforcement of the law in a number of ways. Most importantly, it clarifies that findings by the Commission (whether "Reason To Believe" or "Probable Cause To Believe") or the signing of a conciliation agreement only concerns the treasurer in his or her capacity as representative of the committee, not personally. The practice also ensures that a named individual who signs the conciliation agreement on behalf of the committee (or obtains legal representation on behalf of the committee) is the one empowered by law to disburse committee funds to pay a civil penalty, disgorge funds, make refunds, and carry out other monetary remedies that the committee agrees to through the conciliation agreement.[5] Also, naming a treasurer (in his or her official capacity), as opposed to naming simply the office of treasurer or just the committee, not only provides the Commission with an individual in every instance to serve with notices throughout the proceeding, but also results in more accountability on behalf of the committee—that is, a particular person who will ensure that a committee is responsive to Commission findings.[6] Finally, specifying whether a treasurer is a party to an enforcement proceeding in his or her official or personal capacity is consistent with use of these terms as pleading conventions in court actions. A probable cause finding against a treasurer in his or her official capacity makes clear to a district court in enforcement litigation that the Commission is seeking relief against the committee, and would only entitle the

---

[3] As discussed *infra* Part II., the phrases "official capacity" and "personal capacity" are legal terms of art that permeate such field as sovereign immunity, bankruptcy, corporations, and federal procedure. Their usage instantaneously identifies for the judiciary when the Commission is pursuing treasurers by virtue of their position, rather than by product of their actions.

[4] *See Graham,* 473 U.S. at 165 (42 U.S.C. 1983); *Stafford* v. *Briggs,* 444 U.S. 527, 544 (1980) (venue determination); *Ex Parte Young,* 209 U.S. 123, 159 (1908) (Eleventh Amendment); *Northeast Fed. Credit Union* v. *Neves,* 837 F.2d 531, 534 (1st Cir. 1988) (jurisdictional purposes); *Pelkoffer* v. *Deer,* 144 B.R. 282, 285–86 (W.D. Pa. 1992) (bankruptcy); *Estabrook* v. *Wetmore,* 529 A.2d 956, 958 (N.H. 1987) (applying doctrine that acts of a corporate employee performed in his corporate capacity generally do not form the basis for personal jurisdiction over him in his individual capacity).

[5] In the absence of a treasurer, "the financial machinery of the campaign grinds to a halt * * *" *FEC* v. *Toledano,* 317 F.3d 939, 947 (9th Cir. 2003), *reh'g denied; see* 2 U.S.C. 432(a) ("No expenditure shall be made * * * without the authorization of the treasurer or his or her designated agent."); 11 CFR 102.7(a) (designation of assistant treasurer).

[6] Such accountability may be especially helpful in matters involving committees that tend to be ephemeral—existing for only a short time before permanently disbanding operations.

Commission to obtain a civil penalty from the committee. See *Graham,* 473 U.S. at 165.

## IV. Treasurers in Their Personal Capacities

The Act places certain legal obligations on committee treasurers, the violation of which makes them personally liable.[7] *See, e.g.,* 2 U.S.C. 432(c) (keep an account of various committee records), 432(d) (preserve records for three years), 434(a)(1) (file and sign reports of receipts and disbursements). The Commission's regulations further require treasurers to examine and investigate contributions for evidence of illegality. *See* 11 CFR 103.3. Due to their "pivotal role," treasurers may be held personally liable for failing to fulfill their responsibilities under the Act and the Commission's regulations. *See Toledano,* 317 F.3d at 947 ("The Act requires every political committee to have a treasurer, 2 U.S.C. 432(a), and holds him personally responsible for the committee's recordkeeping and reporting duties, id. 432(c)–(d), 434(a). * * * Federal law makes the treasurer responsible for detecting [facial contribution] illegalities, 11 CFR 103.3(b), and holds him personally liable if he fails to fulfill his responsibilities, see 2 U.S.C. 437g(d) . * * *"); *see also FEC v. John A. Dramesi for Cong. Comm.,* 640 F. Supp. 985 (D.N.J. 1986) (holding treasurer responsible for failing to "make * * * best efforts to determine the legality of" an excessive contribution); *FEC v. Gus Savage for Cong. '82 Comm.,* 606 F. Supp. 541, 547 (N.D. Ill. 1985) ("It is the treasurer, and not the candidate, who becomes the named defendant in federal court, and subjected to the imposition of penalties ranging from substantial fines to imprisonment."); 104.14(d) ("Each treasurer of a political committee, and any other person required to file any report or statement under these regulations and under the Act shall be personally responsible for the timely and complete filing of the report or statement and for the accuracy of any

information or statement contained in it.").

Thus, a treasurer may be named as a respondent in a Matter Under Review in his or her personal capacity, and findings may be made against a treasurer in the same capacity, when the MUR involves the treasurer's violation of a legal obligation that the statute or regulations impose specifically on committee treasurers or when a reasonable inference from the alleged violation is that the treasurer knew, or should have known, about the facts constituting a violation.[8] In practice, however, the Commission intends to consider a treasurer the subject of an enforcement proceeding in his or her personal capacity only when available information (or inferences fairly derived therefrom) indicates that the treasurer had knowledge that his or her conduct violated a duty imposed by law, or where the treasurer recklessly failed to fulfill his or her duties under the act and regulations, or intentionally deprived himself or herself of facts giving rise to the violations. If, at any time in the proceeding, the Commission is persuaded that the treasurer did not act with the requisite state of mind, subsequent findings against the treasurer will only be made in his or her official capacity.[9]

Should the Commission file suit in district court following a finding of probable cause against a treasurer in his or her personal capacity, judicial relief, including an injunction and payment of a civil penalty, could be obtained against the treasurer personally. *Graham,* 473 U.S. at 166–168. Likewise, when the Commission obtains relief from a treasurer personally, the obligation will follow the individual. Thus, when a treasurer in his or her personal capacity agrees to pay a civil

penalty through a conciliation agreement, or is ordered to pay a civil penalty by a district court, a personal obligation exists to pay the civil penalty. (A separate civil penalty would likely be assessed against the committee itself.) Likewise, a cease and desist provision (negotiated through conciliation) or an injunction (imposed by a district court) against a treasurer in his or her personal capacity will still apply to that treasurer in the event he or she subsequently becomes treasurer with another committee. *Cf. Sec'y Exch. Comm'n v. Coffey,* 493 F.2d 1304, 1311 n.11 (6th Cir. 1974) ("The significance of naming an officer * * * personally is that 'otherwise he is bound only as long as he remains an officer * * *', whereas if he is named [personally] he is personally enjoined without limit of time.' ") (quoting 6 L. Loss, *Securities Regulation* 4113 (1969, supp. to 2d ed.)).

## V. Treasurers in Both Capacities

There will likely be cases in which the treasurer is subject to Commission action in both his or her official and personal capacity, as explained in *supra* sections III. and IV. In such cases, the Commission will clearly designate that the findings are being made against the treasurer in both capacities. *See, e.g., United States v. Johnson,* 541 F.2d 710, 711 (8th Cir. 1976) (applying a similar standard in an action involving the Federal Trade Commission when finding that "[t]he propriety of including a person both as an individual and as a corporate officer in a cease and desist order has consistently been upheld in instances where the person included was instrumental in formulating, directing and controlling the acts and practices of the corporation") (citing *Fed. Trade Comm'n v. Standard Ed. Soc'y,* 302 U.S. 112 (1937); *Standard Distrib. v. Fed. Trade Comm'n,* 211 F.2d 7 (2d Cir. 1954); *Benrus Watch Co. v. Fed. Trade Comm'n,* 352 F.2d 313 (8th Cir. 1965)).

For example, if a complaint alleges a violation such as coordination or receipt of contributions in the name of another, the Commission intends initially to name the treasurer as a respondent only in his or her official capacity. Notably, in these cases the reporting violation stems from the same operative facts as the principal violation. Only if the Commission learns later that the treasurer had knowledge of the operative facts—for example, the treasurer knew that an in-kind contribution stemming from coordination went unreported—or acted recklessly, or intentionally deprived himself or herself of the relevant facts, might the Commission make findings

---

[7] If a past or present treasurer violates a prohibition that applies generally to individuals, the treasurer may be named as a respondent in his or her personal capacity, and findings may be made against the treasurer in that capacity. In this way, a treasurer would be treated no differently than any other individual who violates a provision of the Act. The Act and the Commission's regulations apply to any "person," which includes individuals. *See, e.g.,* 2 U.S.C. 432(b) (forward contributions to the committee's treasurer), 441e (receipt of contributions from foreign nationals), and 441f (making and knowingly accepting contributions in the name of another).

[8] Indeed, if FECA were construed to impose liability on treasurers only in their official capacities, it would effectively mean that only committees are liable for violations under the statute—which would have been easy enough for Congress to accomplish by writing the Act to impose reporting, recordkeeping, and other duties on "committees" rather than "treasurers." In fact, in some instances, the Act and the Commission's regulations specifically impose obligations on committees and committee officers and candidates. *See, e.g.,* 2 U.S.C. 441a(f) (receipt of excessive contributions), 11 CFR 104.7(b) (best efforts).

[9] Conversely, when a reason-to-believe finding is made against a treasurer in his or her official capacity only, but the potential violations at issue involve obligations specifically imposed by the Act or regulations on treasurers, the notice of the finding will be accompanied by a letter advising that the Commission could later decide to pursue the treasurer in a personal capacity if information shows that the treasurer knowingly and willfully violated the Act, or recklessly failed to fulfill the duties imposed by law, or intentionally deprived himself or herself of the operative facts giving rise to the violation.

against the treasurer in his or her personal capacity.

In cases where the treasurer is subject to Commission action in both official and personal capacities, the respondents could be named as "John Doe for Congress and Joe Smith, in his official capacity as treasurer and in his personal capacity." Alternatively, the respondents could be named as "John Doe for Congress and Joe Smith, in his official capacity as treasurer" and "Joe Smith, in his personal capacity." Regardless of the form of the notification, where a treasurer has been named in both his or her official and personal capacities, any resulting conciliation agreement would be signed by the treasurer on behalf of both the committee and the treasurer in his or her personal capacity.

## VI. Successor Treasurers/Substitution

An issue closely related to the official/personal capacity distinction is whether a successor treasurer may be substituted for a predecessor treasurer in a matter under review. Often the specific individual who was the treasurer at the time of a violation is no longer the treasurer during the enforcement process. Whether the successor treasurer or the predecessor treasurer should be named as the respondent depends on whether the Commission is pursuing the treasurer in his or her official capacity, personal capacity, or both.

Currently, when OGC discovers that a committee has changed treasurers after the date of the activity on which the finding was based, OGC typically notes the change of treasurer, the date of the change, the former treasurer's name, and indicates whether an amendment was made to the Statement of Organization in OGC's next report to the Commission. If a treasurer change is made after a finding of reason to believe, then OGC typically includes the new treasurer and notes the change in its next report on the matter. If a treasurer change is made after a finding of probable cause to believe, OGC sends the new treasurer a supplemental probable cause brief (incorporating the prior probable cause brief), which states that the Commission found probable cause to believe against the committee and the treasurer's predecessor and will recommend probable cause against the new treasurer. After receiving a response or waiting until the expiration of the response period, OGC typically returns to the Commission with a recommendation as to the new treasurer.

When the Commission pursues a current treasurer in his or her official

capacity, successor treasurers will be substituted for the predecessor treasurer. In such cases, the Commission is pursuing the official position (and, therefore, the entity), not the individual holding the position. *See Will,* 491 U.S. at 71. Because an official capacity action is an action against the treasurer's position, the Commission may summarily substitute a new treasurer in his or her official capacity at any stage prior to a finding of probable cause to believe.[10]

When a predecessor treasurer may be personally liable, the Commission could pursue the predecessor treasurer individually, and not substitute the successor treasurer for the predecessor treasurer individually. *See* fn. 7; *Graham,* 473 U.S. at 167–68. There would be no legal basis for imputing personal liability from a predecessor treasurer's misconduct to a successor treasurer who did not personally engage in the misconduct.

If the Commission were to pursue a treasurer both officially and personally and this treasurer is later replaced, the Commission could pursue the predecessor treasurer for any violations for which he or she is personally liable, and substitute the successor treasurer for official capacity violations. Absent some independent basis of liability, the Commission does not intend to pursue intermediate treasurers.[11] *See Cal. Democratic Party* v. *FEC,* 13 F. Supp. 2d 1031, 1037 (E.D. Cal. 1998) (dismissing individual capacity claims against a former treasurer because "there is no allegation that [the treasurer] violated any personal obligation" and dismissing official capacity claims against him "since [he] is no longer treasurer * * * and thus, is not the appropriate person against

whom an official capacity suit can be maintained. * * *").[12]

## VII. Conclusion

Effective as of the date this Policy Statement is published in the **Federal Register,** and as more fully explained above, the Commission will consider treasurers of political committees subject to enforcement proceedings as follows:

1. In enforcement proceedings where a political committee is a respondent, the committee's current treasurer will be subject to Commission action "in (his or her) official capacity as treasurer."

2. In enforcement proceedings where information indicates that a treasurer (past or present) of a political committee (a) knowingly and willfully violated the Act or regulations, (b) recklessly failed to fulfill the duties imposed by a provision of the Act or regulations that applies specifically to treasurers, or (c) intentionally deprived himself or herself of the operative facts giving rise to a violation, the treasurer may be subject to Commission action "in (his or her) personal capacity."

3. In enforcement proceedings where information indicates that a treasurer of a political committee is subject to findings in both an official and personal capacity (*i.e.,* information indicates that the committee's current treasurer violated the Act or regulations with the requisite state of mind described in #2 above), the current treasurer may be subject to Commission action in both an official and personal capacity.

4. When the Commission makes findings as to a treasurer in his or her official capacity, successor treasurers will be substituted as if the findings had been made as to the successor.

5. In enforcement proceedings involving provisions of the Act or regulations that apply generally to individuals (*e.g.,* prohibitions against the making of an excessive contribution), the treasurer will be subject to Commission action in his or her personal capacity the same as any other individuals.

---

[10] Pursuant to the final policy, the Commission is not legally obligated to undertake the requirements of 2 U.S.C. 437g(a)(3) when a successor treasurer begins his or her position; although not legally required to do so, the Commission would intend to inform a new treasurer of the pending action and make copies of the briefs available to the successor treasurer.

[11] For example, while Treasurer A is the treasurer for Joe Smith for Congress, a violation occurs that subjects A to official liability and potentially to individual liability. Treasurer A would be named in his official capacity and notified in a reason-to-believe notification of the potential for personal liability. After the enforcement action has begun, Treasurer A resigns and Treasurer B takes over. The Commission would pursue Treasurer B in her official capacity, and if the circumstances warranted, Treasurer A in his individual capacity. If Treasurer B resigns and is succeeded by Treasurer C prior to the conclusion of the enforcement matter, the Commission would then continue to pursue Treasurer A in his individual capacity and pursue Treasurer C in her official capacity. Treasurer B would no longer be named in her official capacity.

[12] A deeper examination of the court file indicates that—despite the *California Democratic Party* court's assertion to the contrary—the Commission never actually pled that the treasurer in this case was personally liable. Rather, the complaint references the treasurer "as treasurer" and the Commission's response to the treasurer's motion to dismiss indicates that the Commission was pursuing the treasurer "in his official capacity." Compl., paragraphs 8, 58–59, Prayer paragraphs 1–5; Resp. to Def. Mot. to Dismiss, p. 21. However, the court's statement in *California Democratic Party* underscores the need for the Commission to delineate more clearly in which capacity it pursues treasurers.

Dated: December 23, 2004.

Bradley A. Smith,

*Chairman, Federal Election Commission.*

[FR Doc. 04–28668 Filed 12–30–04; 8:45 am]

BILLING CODE 6715–01–P

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2004–19969; Directorate Identifier 2004–SW–43–AD; Amendment 39–13923; AD 2004–26–11]**

**RIN 2120–AA64**

**Airworthiness Directives; Bell Helicopter Textron Canada Model 222, 222B, 222U, 230, and 430 Helicopters**

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Final rule; request for comments.

---

**SUMMARY:** This amendment adopts a new airworthiness directive (AD) for the specified Bell Helicopter Textron (BHTC) model helicopters. This action requires certain checks and inspections of the tail rotor blades. If a crack is found, before further flight, this AD requires replacing the tail rotor blade (blade) with an airworthy blade. This amendment is prompted by three reports of cracked blades found during scheduled inspections. The actions specified in this AD are intended to detect a crack in the blade and prevent loss of a blade and subsequent loss of control of the helicopter.

**DATES:** Effective January 18, 2005.

Comments for inclusion in the Rules Docket must be received on or before March 4, 2005.

**ADDRESSES:** Use one of the following addresses to submit comments on this AD:

• DOT Docket Web site: Go to *http://dms.dot.gov* and follow the instructions for sending your comments electronically;

• Government-wide rulemaking Web site: Go to *http://www.regulations.gov* and follow the instructions for sending your comments electronically;

• Mail: Docket Management Facility; U.S. Department of Transportation, 400 Seventh Street, SW., Nassif Building, Room PL–401, Washington, DC 20590;

• Fax: (202) 493–2251; or

• Hand Delivery: Room PL–401 on the plaza level of the Nassif Building, 400 Seventh Street, SW., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

You may get the service information identified in this AD from Bell Helicopter Textron Canada, 12,800 Rue de l'Avenir, Mirabel, Quebec J7J1R4, telephone (450) 437–2862 or (800) 363–8023, fax (450) 433–0272.

*Examining the Docket*

You may examine the docket that contains the AD, any comments, and other information on the Internet at *http://dms.dot.gov*, or in person at the Docket Management System (DMS) Docket Offices between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Docket Office (telephone (800) 647–5227) is located on the plaza level of the Department of Transportation Nassif Building at the street address stated in the **ADDRESSES** section. Comments will be available in the AD docket shortly after the DMS receives them.

**FOR FURTHER INFORMATION CONTACT:** Sharon Miles, Aviation Safety Engineer, FAA, Rotorcraft Directorate, Regulations and Guidance Group, Fort Worth, Texas 76193–0111, telephone (817) 222–5122, fax (817) 222–5961.

**SUPPLEMENTARY INFORMATION:** This amendment adopts a new AD for the specified BHTC model helicopters. This action requires certain checks and inspections of the blades. If a crack is found, before further flight, this AD requires replacing the blade with an airworthy blade. This amendment is prompted by three reports of cracked blades found during scheduled inspections. This condition, if not detected, could result in loss of a blade and subsequent loss of control of the helicopter.

Transport Canada, the airworthiness authority for Canada, notified the FAA that an unsafe condition may exist on the specified BHTC model helicopters. Transport Canada advises of the discovery of cracked blades during scheduled inspections on three occasions. Two cracks originated from the outboard feathering bearing bore underneath the flanged sleeves. The third crack started from the inboard feathering bearing bore. Investigation found that the cracks originated from either a machining burr or a corrosion site in the bearing bore underneath the flanged sleeves.

BHTC has issued Alert Service Bulletin (ASB) No. 222–04–100 for Model 222 and 222B helicopters, No. 222U–04–71 for Model 222U helicopters, No. 230–04–31 for Model 230 helicopters, and No. 430–04–31 for Model 430 helicopters, all dated August 27, 2004. The ASBs specify a repetitive visual inspection every 3 hours time-in-service (TIS) and a 50-hour inspection of the blade root end around the feathering bearings for a crack. Transport Canada classified these ASBs as mandatory and issued AD CF–2004–21, dated October 28, 2004, to ensure the continued airworthiness of these helicopters in Canada.

These helicopter models are manufactured in Canada and are type certificated for operation in the United States under the provisions of 14 CFR 21.29 and the applicable bilateral agreement. Pursuant to the applicable bilateral agreement, Transport Canada has kept the FAA informed of the situation described above. The FAA has examined the findings of Transport Canada, reviewed all available information, and determined that AD action is necessary for products of these type designs that are certificated for operation in the United States.

This unsafe condition is likely to exist or develop on other helicopters of the same type designs. Therefore, this AD is being issued to prevent loss of a blade and subsequent loss of control of the helicopter. This AD requires the following:

• Within 3 hours time-in-service (TIS), and at specified intervals, clean and visually check both sides of each blade for a crack in the area around the tail rotor feathering bearing. An owner/operator (pilot) may perform the check for cracked blades. Pilots may perform these checks because they require no tools, can be done by observation, and can be done equally well by a pilot or a mechanic. However, the pilot must enter compliance with these requirements into the helicopter maintenance records by following 14 CFR 43.11 and 91.417(a)(2)(v).

• Within 50 hours TIS and at specified intervals, clean and inspect both sides of each blade for a crack using a 10X or higher magnifying glass.

• If a crack is found even in the paint during a visual check or during a 50-hour TIS inspection, before further flight, a further inspection of the blade for a crack is required as follows:

• Remove the blade. Remove the paint to the bare metal in the area of the suspected crack by using Plastic Metal Blasting (PMB) or a nylon web abrasive pad and abrading the blade surface in a span-wise direction only.

• Using a 10X or higher power magnifying glass, inspect the blade for a crack.

• If a crack is found, before further flight, replace the blade with an airworthy blade.

• If no crack is found in the blade surface, refinish the blade by applying one coat of MIL–P–23377 or MIL–P–85582 Epoxy Polyamide Primer so that the primer overlaps the existing coats

Tab B

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL

2005 AUG 12 P 4: 37

# FEDERAL ELECTION COMMISSION

In the matter of : Americans for a Republican Majority Political Action Committee
                    Corwin Teltschik, Treasurer    MUR No.: _____



MUR # 5675

## COMPLAINT

1.      Citizens for Responsibility and Ethics in Washington hereby brings this

complaint before the Federal Election Commission seeking an immediate FEC investigation and

enforcement action against Americans for a Republican Majority Political Action Committee

and Corwin Teltschik for direct and serious violations of federal campaign finance law.

### Complainant

2.      Citizens for Responsibility and Ethics in Washington is a non-profit, non-partisan

organization dedicated to ensuring accountability in public officials.

### Respondents

3.      Americans for a Republican Majority Political Action Committee ("ARMPAC")

is a political committee registered under the Federal Election Campaign Act.  2 U.S.C. §433.

Corwin Teltschik is the treasurer of ARMPAC.

### Factual Allegations

4.      On August 10, 2005, the Audit Division of the Federal Election Commission

("FEC") issued a report regarding the results of the FEC's audit of ARMPAC.  The audit made

findings in three areas: 1) ARMPAC materially misstated its finances for the calendar years

2001 and 2002; 2) ARMPAC failed to report debts owed to 25 vendors in the amount of

$322,306; and 3) ARMPAC improperly allocated expenses between its federal and non-federal

accounts.  Report of the Audit Division on Americans for a Republican Majority, Jan. 1, 2001 -

Dec. 31, 2002, [hereinafter Audit Report] page 3.

## COUNT I

5.      The Federal Election Campaign Act ("FECA") requires political action committees to accurately report their cash on hand at the beginning and end of each reporting period; the total amount of receipts for the reporting period and the calendar year; the total amount of disbursements for the reporting period and for the calendar year; and certain transactions that require itemization in Schedule A or Schedule H4.  2 U.S.C. §§434(b)(1),(2) and (4).

6.      The audit staff reconciled ARMPAC's reported activity to bank records for calendar years 2001 and 2002 and found numerous discrepancies.  For 2001, the Audit staff found that ARMPAC overstated its beginning cash balance by $3,413; that it overstated its receipts by $64,477; that it overstated its disbursements by $9,818; and that it overstated its ending cash balance by $58, 072.  For 2002, the Audit staff found that ARMPAC overstated its beginning cash balance by $58, 072; that it understated its receipts by $125,716; that it understated its disbursements by $40,624; and that it understated its ending cash balance by $27,020.  By materially misrepresenting its financial information, ARMPAC violated 2 U.S.C. §§434(b)(1), (2), and (4).

## COUNT II

7.      A political committee must disclose the amount and nature of outstanding debts and obligations until those debts are extinguished.  2 U.S.C. §434(b)(8); 11 C.F.R. §104.3(d) and §104.11(a).  A debt of $500 or less must be reported on the next regularly scheduled report once it has been outstanding for 60 days from the date incurred while a debt exceeding $500 must be disclosed in the report that covers the date on which the debt was incurred.  11 C.F.R. §104.11(b).

8.    Disclosure reports filed by ARMPAC during the audit period did not disclose any debts owed by ARMPAC. <u>Audit Report</u> at 7. After reviewing the disbursements, however, the Audit staff identified debts owed to 25 vendors, totaling $322,306 that should have been disclosed. <u>Id</u>. The Audit staff further found that the majority of the debts were outstanding over several reporting periods, but not reported. As a result, ARMPAC has violated 11 C.F.R. §104.11(b).

9.    Although the Audit Report is silent on the question, the existence of the $322,306 suggests the possibility of further violations of the FECA. According to the guidance provided to nonconnected committees by the Federal Election Commission, a "vendor may not extend credit to a political committee for a longer period of time than is normally practiced in the creditor's trade." "When a political committee fails to pay a debt owed to a . . . vendor within the time specified by the vendor, a prohibited contribution by the vendor may result . . . if the vendor fails to make a commercially reasonable attempt to collect a debt from the committee . . ." <u>Campaign Guide for Nonconnected Committees</u>, at 11; <u>see also</u> 11 C.F.R. §116.3. Here, if ARMPAC failed to pay any of its creditors in a "commercially reasonable" time period, ARMPAC may be deemed to have accepted unreported contributions from these creditors.

10.    Moreover, if any of ARMPAC's creditors are corporations, and the FEC finds that these corporations failed to collect payment from ARMPAC in a reasonable time period, these corporations may be deemed to have made contributions to ARMPAC. Corporations, however, are prohibited from making contributions to federal political action committees, meaning that any such contributions would have been made and accepted in violation of the FECA. 2 U.S.C. §441b(a).

3

11.    Finally, the FECA limits PACs to accepting no more than $5,000 per election from any contributor.  2 U.S.C. §441a(a)(1)(C).  If the FEC finds that ARMPAC failed to pay any debts of over $5,000 such that those debts now amount to contributions, those contributions would be illegal excessive in-kind contributions.

<u>COUNT III</u>

12.    A committee that finances political activity in connection with both federal and non-federal elections must establish two accounts and allocate shared expenses between the two accounts.  Alternatively, the committee may conduct both federal and non-federal activity from one bank account, considered a federal account.  11 C.F.R. §102.5(a)(1)(i).  A federal account may contain only those funds that are permissible under the FECA; the non-federal account may contain funds that are not permitted under federal law.  11 C.F.R. §102.5(a)(1)(i) and (a)(3).  A political committee that allocates federal/non-federal expenses must report each disbursement it makes from its federal account to pay for a shared federal/non-federal expense.  11 C.F.R. §104.10(b)(4).

13.    In allocating funds for generic voter drives, nonconnected committees must allocate all of their costs.  11 C.F.R. §106.6(b)(2)(iii).  Administrative expenses and the costs of generic voter drives must be allocated based on the ratio of federal expenditures to the total of federal and non-federal expenditures.  The federal and non-federal expenditures are limited to expenditures made in direct support of candidates.  11 C.F.R. §106.6(c)(1).

14.    In allocating fundraising expenses between federal and non-federal funds, a committee must allocate the direct cost of the fundraising event based upon the ratio of funds received by the federal account to the total amount raised for the event.  11 C.F.R. §106.5(f)(1).

4

15.     ARMPAC maintained separate federal and non-federal bank accounts.  <u>Audit</u>
<u>Report</u> at 8.  It paid shared expenses from the federal account and transferred funds from the
non-federal account to the federal account to cover the non-federal share of those expenses.  <u>Id</u>.
The Audit staff reviewed disbursements from both the federal and non-federal accounts for
administrative expenses and generic voter drive costs and found that the non-federal had
overfunded its share of allocable expenses by $211,281.  <u>Id</u>.[1]  The Audit staff found that
ARMPAC had improperly used an allocation ratio of 50% federal and 50% non-federal for these
expenses.  <u>Id</u>. at 9.  The correct ratio, according to the Audit staff, would have been 93% federal
and 7% non-federal.  <u>Id</u>.  Therefore, the non-federal overpaid its portion of such allocable
expenses.  Significantly, this means that prohibited funds – including soft money – may have
been used to fund ARMPAC's federal expenses in violation of the FECA.  2 U.S.C. §441b(a).

16.     Similarly, ARMPAC used an improper ratio to allocate expenses for eight
fundraising events.  <u>Audit Report</u> at 9.  Correcting the ratios, the Audit staff found that the non-
federal account had overpaid the expenses of these fundraising events by $9,414.  <u>Id</u>.  Again, this
means that prohibited funds may have been used to fund ARMPAC's federal expenses in
violation of the FECA.  2 U.S.C. §441b(a).

17.     The Audit staff reviewed 112 payments totaling $418,352 in what ARMPAC
termed non-federal disbursements to consulting/fundraising vendors for fundraising expenses.
<u>Audit Report</u> at 10.  ARMPAC provided contracts and affidavits that described these services as
non-federal fundraising activity.  <u>Id</u>.  Contrary to this contention, however, the Audit staff found
that the documentation provided by ARMPAC did not show separate non-federal fundraising

---

[1] ARMPAC provided additional documentation that reduced the liability to the non-
federal account from $211,281 to $203,483.  <u>Audit Report</u> at 7.

activity. Id. In fact, the Audit staff found just the opposite: that the documentation provided by ARMPAC indicated that the fundraising efforts were shared by both the federal and non-federal accounts. Id. As a result, the Audit staff found that the federal portion of the fundraising expenses paid from the non-federal account was $95,386. Id. Yet again, this means that ARMPAC may have used prohibited soft money to pay for the federal account's expenses. 2 U.S.C. §441b(a).

WHEREFORE, Citizens for Responsibility and Ethics in Washington requests that the Federal Election Commission conduct an investigation into these allegations, declare the respondents to have violated the federal campaign finance laws, impose sanctions appropriate to these violations and take such further action as may be appropriate.

Melanie Sloan, Executive Director
Citizens for Responsibility and Ethics in Washington
11 Dupont Circle, N.W., 2nd Floor
Washington, D.C. 20036
(202) 588-5565

## Verification

Citizens for Responsibility and Ethics in Washington, acting through Melanie Sloan, hereby verifies that the statements made in the attached Complaint are, upon information and belief, true.

Sworn pursuant to 18 U.S.C. § 1001.

_Melanie Sloan_

Sworn to and subscribed before me this 13th day of August, 2005.

_Blanca M. Clayton_
Notary Public

Blanca M. Clayton
Notary Public, District of Columbia
My Commission Expires 04-30-2007

Tab C

# STATEMENT OF DESIGNATION OF COUNSEL

### Please use one form for each respondent

RECEIVED
FEC MAIL
OPERATIONS CENTER

2005 SEP 30 P 1: 05

MUR  5675

NAME OF COUNSEL: Don McGahn

FIRM: McGahn & Associates, PLLC

ADDRESS: 601 Pennsylvania Avenue, NW

Suite 900 South Building

Washington, DC  20004

TELEPHONE:(202) 744-3997

FAX:

2005 SEP 30 P 2: 4

RECEIVED
FEDERAL ELECTION
COMMISSION
FINANCE OFFICE

The above-named individual is hereby designated as my counsel and is authorized to receive any notifications and other communications from the Commission and to act on my behalf before the Commission.

Barbara Bonfiglio
Print Name

Date  9/30/05        Signature

Title  Asst. Treasurer

RESPONDENT'S NAME:  Barbara Bonfiglio, Assistant Treasurer, ARMPAC

ADDRESS:  Williams & Jenson

1155 21st Street, N.W. - Suite 300

Washington, D.C.  20036

TELEPHONE:  BUSINESS  (202) 659-8201

Tab D

NOV 0 9 2005

RECEIVED
FEDERAL ELECTION
COMMISSION
SECRETARIAT

**FEDERAL ELECTION COMMISSION**
**999 E Street, N.W.**
**Washington, D.C. 20463**

2005 NOV -9 A 11: 22

**FIRST GENERAL COUNSEL'S REPORT**

**SENSITIVE**

__AR 05-06__

| | |
|---|---|
| SOURCE: | Internally Generated (Audit Division) |
| RESPONDENTS: | Americans for a Republican Majority and Corwin Teltschik, in his official capacity as Treasurer |

DATE REFERRED: August 9, 2005
DATE ACTIVATED: October 13, 2005

EXPIRATION OF SOL: February 2, 2006 – January 30, 2008

__MUR 5675__

| | |
|---|---|
| COMPLAINANT: | Citizens for Responsibility and Ethics in Washington |
| RESPONDENTS: | Americans for a Republican Majority and Corwin Teltschik, in his official capacity as Treasurer |

DATE COMPLAINT FILED: August 12, 2005
DATE OF NOTIFICATION: August 17, 2005
DATE ACTIVATED: October 13, 2005

EXPIRATION OF SOL: February 2, 2006 – January 30, 2008

| RELEVANT STATUTE(S): | 2 U.S.C. § 434(b) |
|---|---|
| | 11 C.F.R. § 102.5(a) |
| | 11 C.F.R. § 104.3(d) |
| | 11 C.F.R. § 104.10(b)(4) |
| | 11 C.F.R. § 104.11 |
| | 11 C.F.R. § 106.5(f) |
| | 11 C.F.R. § 106.6 |

| INTERNAL REPORTS CHECKED: | Audit Documents |
|---|---|
| | Disclosure Reports |

FEDERAL AGENCIES CHECKED: None

AR 05-06/MUR 5675 (ARMPAC)
First General Counsel's Report
Page 2

## I.    INTRODUCTION

The Commission audited Americans for a Republican Majority ("ARMPAC" or "the Committee"), a non-connected committee founded and chaired by United States Representative Tom DeLay that maintains both federal and non-federal accounts, pursuant to 2 U.S.C. § 438(b). On July 28, 2005, the Commission approved the Final Audit Report on ARMPAC, covering the Committee's activities from January 1, 2001 through December 31, 2002. *See* Attachment 1. The Audit Division subsequently referred the findings to this Office for possible compliance action.

Following the release of the Audit Report, Citizens for Responsibility and Ethics in Washington filed a complaint with the Commission alleging that ARMPAC violated provisions of the Federal Election Campaign Act of 1971, as amended ("the Act"). The allegations in the Complaint largely mirror the findings in the Audit Report.

This Office recommends that the Commission open a MUR for the audit referral and merge this with MUR 5675. Furthermore, this Office recommends that the Commission make the appropriate reason to believe findings with respect to ARMPAC

## II.    BACKGROUND

The Audit Report found that the Committee: (1) materially misstated financial activity for the 2001 and 2002 calendar years; (2) failed to properly report debts owed to twenty-five vendors in the amount of $322,306; and (3) over funded the non-federal account's share of expenses by $203,483.[1]

---

[1] The Committee had combined receipts of $3,631,281 and disbursements of $3,709,757 in 2001-2002.

AR 05-06/MUR 5675 (ARMPAC)
First General Counsel's Report
Page 3

1    The first finding relates violations of 2 U.S.C. § 434(b) stemming from the Committee's

2    failure accurately report $74,295 in financial activity in 2001 and $166,340 in financial activity

3    in 2002. *See* Audit Referral at 3-5. These amounts include various receipts, disbursements and

4    transfers that were either not reported or misreported to the Commission. In response to the

5    Interim Audit Report, ARMPAC amended its disclosure reports to materially correct the

6    reporting errors. Although the Audit Division referred only the 2002 reporting errors to this

7    Office, the complaint in MUR 5675 incorporated the 2001 reporting errors in its allegations.

8    The second finding relates to ARMPAC's violations of 2 U.S.C. § 434(b) and 11 C.F.R.

9    §§ 104.3(d) and 104.11 stemming from its failure to report $322,306 in debt owed to twenty-five

10    vendors. *See* Audit Report at 7. The Committee's disclosure reports during the 2002 election

11    cycle did not disclose any debts owed by the Committee. The Audit Division reviewed

12    disbursements made by ARMPAC and identified debts to twenty-five vendors that were not

13    included in any disclosure reports. In response to the Interim Audit Report, ARMPAC filed

14    amended reports, which included Schedules D (Debts and Obligations excluding Loans) that

15    materially disclosed these debts.

16    The third finding relates to ARMPAC's violations of 11 C.F.R. §§ 102.5(a), 104.10(b)(4),

17    106.5(f) and 106.6 stemming from the non-federal account's overpayment of $203,483 in shared

18    federal and non-federal expenses. *See* Audit Report at 7-10. ARMPAC used the incorrect ratio

19    for allocating administrative and get-out-the-vote expenses between the federal and non-federal

20    account resulting in an overpayment of $121,456 from the non-federal account. The Committee

21    also used the incorrect ratios for allocating expenses for eight fundraising events resulting in an

22    overpayment of $9,414 from the non-federal account. Based on the fundraising ratios calculated

AR 05-06/MUR 5675 (ARMPAC)
First General Counsel's Report
Page 4

1  for the eight fundraising events, the Audit Division also found that the non-federal account paid

2  $95,386 in shared expenses for fundraising expenses to vendors and consultants that should have

3  been charged to the federal account. *See id.* In response to the Interim Audit Report, ARMPAC

4  provided additional documentation reducing the over funding from the non-federal account from

5  $211,281 to $203,483 and submitted amended disclosure reports to reflect the changes.

6  ARMPAC has reimbursed the non-federal account, $60,728 of the $203,483 over funding.

7        In addition to restating the findings from the Audit Report, complainants in MUR 5675,

8  however, also alleged that ARMPAC may have accepted corporate contributions in violation of

9  2 U.S.C. § 441b(a) and excessive in-kind contributions in violation of 2 U.S.C. § 441a(a)(1)(C)

10  in connection with the $322,306 in debts referenced in connection with the second Audit finding.

11  *See* Complaint at 3-4.

12  **III.    FACTUAL AND LEGAL ANALYSIS**

13        Based on the analysis set forth in the Audit Report, this Office recommends that the

14  Commission find reason to believe that ARMPAC and its treasurer violated 2 U.S.C. § 434(b)

15  and 11 C.F.R. §§ 102.5(a), 104.3(d), 104.10, 104.11, 106.5(f) and 106.6.

16        The sole new allegation in MUR 5675 is that unreported debts recounted in the second

17  finding in the Audit Report may constitute contributions from the creditors to ARMPAC. *See*

18  Complaint at 3. The complaint further suggests that these may constitute prohibited corporate

19  contributions or excessive in-kind contributions. *See id* at 3-4.

20        The Act prohibits corporations from making contributions or expenditures in connection

21  with any election. *See* 2 U.S.C. § 441b(a); 11 C.F.R. § 114.2. A contribution is defined as "any

22  gift, subscription, loan, advance, or deposit of money or anything of value made by any person

AR 05-06/MUR 5675 (ARMPAC)
First General Counsel's Report
Page 5

1    for the purpose of influencing any election." 2 U.S.C. § 431(8)(A)(i).  An extension of credit by

2    a commercial vendor, including a corporation acting in its capacity as a commercial vendor, will

3    not be considered a contribution provided that credit is extended in the ordinary course of the

4    vendor's business and the terms are substantially similar to extensions of credit to non political

5    debtors of similar risk and size of obligation.  *See* 11 C.F.R. §§ 116.3(a) and 116.3(b).  A

6    contribution will result, however, if the creditor fails to make a commercially reasonable attempt

7    to collect the debt.  *See* 11 C.F.R. § 116.4.

8         In assessing whether the credit was extended in the ordinary course of the commercial

9    vendor's business, the Commission will consider:  (1) whether the commercial vendor followed

10   its established procedures and its past practice in approving the extension of credit; (2) whether

11   the commercial vendor received prompt payment in full if it previously extended credit to the

12   same candidate or political committee; and (3) whether the extension of credit conformed to the

13   usual and normal practice in the commercial vendor's trade.  *See* 11 C.F.R. § 116.3(c).

14        The complaint fails to identify which debts may constitute prohibited or excessive

15   contributions.  The transactions at issue here generally involve payments to commercial vendors

16   that were paid in full by ARMPAC within 30-60 days of receiving the invoices, although four

17   debts were paid from three to five months after the date of invoice.  There is no indication from

18   the records provided during the audit indicating that these extensions of credit were not made in

19   the ordinary course of business, and ARMPAC's response to the complaint in MUR 5675 states

20   that these debts were paid in accordance with agreements between ARMPAC and its vendors.

21   *See* ARMPAC response at 10.  Given the speculative nature of these allegations, this Office

22   recommends that the Commission find no reason to believe that Americans for a Republican

AR 05-06/MUR 5675 (ARMPAC)
First General Counsel's Report
Page 6

1    Majority and Corwin Teltschik, in his official capacity as Treasurer, violated 2 U.S.C. §§ 441a or

2    441b with respect to potential additional violations of the Act stemming from the $322,306 in

3    unreported debt.

4    **IV.    PROPOSED CONCILIATION**

AR 05-06/MUR 5675 (ARMPAC)
First General Counsel's Report
Page 7

1
2

3

4

5    **V.    RECOMMENDATIONS**

6    1.    Open a MUR in connection with Audit Referral 05-06 and merge into MUR 5675.
7
8    2.    Find reason to believe Americans for a Republican Majority and Corwin
9          Teltschik, as Treasurer, violated 2 U.S.C. § 434(b) and 11 C.F.R. §§ 102.5(a),
10         104.3(d), 104.10(b)(4), 104.11, 106.5(f) and 106.6.
11
12   3.
13
14
15   4.    Approve the attached Factual and Legal Analysis.
16
17   5.
18
19   6.    Approve the appropriate letter.
20
21
22
23

AR 05-06/MUR 5675 (ARMPAC,
First General Counsel's Report
Page 8

Lawrence H. Norton
General Counsel

Rhonda J. Vosdingh
Associate General Counsel
 for Enforcement

BY:

Mark D. Shonkwiler
Assistant General Counsel

Lynn Y. Tran
Attorney

_11/8/05_
Date

Attachments:
 1. Audit Report
 2. Factual and Legal Analysis



# Report of the Audit Division on Americans for a Republican Majority
## January 1, 2001- December 31, 2002

## Why the Audit Was Done

Federal law permits the Commission to conduct audits and field investigations of any political committee that is required to file reports under the Federal Election Campaign Act (the Act). The Commission generally conducts such audits when a committee appears not to have met the threshold requirements for substantial compliance with the Act.[1] The audit determines whether the committee complied with the limitations, prohibitions and disclosure requirements of the Act.

## Future Action

The Commission may initiate an enforcement action, at a later time, with respect to any of the matters discussed in this report.

## About the Committee (p. 2)

Americans for a Republican Majority (ARMPAC) is a non-connected committee. ARMPAC qualified for multi-candidate status on October 20, 1994, and is headquartered in Washington, DC. For more information, see chart on the Committee Organization, p. 2.

## Financial Activity (p. 2)

- Receipts
  - o Contributions from Individuals ............ $ 2,501,934
  - o Other Political Committees ............ 847,016
  - o Transfers from Non-federal Account for Joint Activity ............ 255,758
  - o Offsets to Expenditures ............ 16,149
  - o Refund of Contributions Made ............ 8,146
  - o Other Receipts ............ 2,278
  - o **Total Receipts** ............ **$ 3,631,281**

- Disbursements
  - o Operating Expenditures (including other disbursements) ............ $ 2,663,757
  - o Contributions to Federal Candidates/Other Political Committees ............ 1,046,000
  - o **Total Disbursements** ............ **$ 3,709,757**

## Findings and Recommendations (p. 3)

- Misstatement of Financial Activity (Finding 1)
- Reporting of Debts and Obligations (Finding 2)
- Non-federal Funding of Federal Activity (Finding 3)

---

[1] 2 U.S.C. §438(b).

# Table of Contents

|  | **Page** |
|---|---|
| **Part I.  Background** |  |
| Authority for Audit | 1 |
| Scope of Audit | 1 |
| Changes to the Law | 1 |
| **Part II.  Overview of Committee** |  |
| Committee Organization | 2 |
| Overview of Financial Activity | 2 |
| **Part III.  Summaries** |  |
| Findings and Recommendations | 3 |
| **Part IV.  Findings and Recommendations** |  |
| Finding 1.  Misstatement of Financial Activity | 4 |
| Finding 2.  Reporting of Debts and Obligations | 6 |
| Finding 3.  Non-federal Funding of Federal Activity | 7 |



# Part I
# Background

### Authority for Audit

This report is based on an audit of the Americans for a Republican Majority (ARMPAC),
undertaken by the Audit Division of the Federal Election Commission (the Commission)
in accordance with the Federal Election Campaign Act of 1971, as amended (the Act).
The Audit Division conducted the audit pursuant to 2 U.S.C. §438(b), which permits the
Commission to conduct audits and field investigations of any political committee that is
required to file a report under 2 U.S.C. §434.  Prior to conducting any audit under this
subsection, the Commission must perform an internal review of reports filed by selected
committees to determine if the reports filed by a particular committee meet the threshold
requirements for substantial compliance with the Act.  2 U.S.C. §438(b).

### Scope of Audit

This audit examined:
1. The receipt of excessive contributions and loans.
2. The receipt of contributions from prohibited sources.
3. The disclosure of contributions and other receipts.
4. The disclosure of disbursements, debts and obligations.
5. The disclosure of expenses allocated between federal and non-federal accounts.
6. The consistency between reported figures and bank records.
7. The completeness of records.
8. Other committee operations necessary to the review.

### Scope Limitations

In maintaining its receipt and disbursement records, ARMPAC satisfied the minimum
recordkeeping requirements of 11 CFR §102.9.  However, the Audit staff's testing of
contributions from individuals was limited by the lack of external documentation, such as
copies of contributor checks, for about 28% of such contributions selected for review on
a sample basis.  This lack of records limited the testing for the disclosure of the
contributors' name, address, and the date and amount of contribution.  The testing of
operating disbursements was similarly limited by the lack of external documentation,
such as copies of vendor invoices, for approximately 33% of the operating disbursements
selected for review on a sample basis.

### Changes to the Law

On March 27, 2002, President Bush signed into law the Bipartisan Campaign Reform Act
of 2002 (BCRA).  The BCRA contains many substantial and technical changes to the
federal campaign finance law.  Most of the changes became effective November 6, 2002.
Except for the period November 6, 2002, through December 31, 2002, the period covered
by this audit pre-dates these changes.  Therefore, the statutory and regulatory
requirements cited in this report are primarily those that were in effect prior to November
6, 2002.

ATTACHMENT  1
Page  3  of  14

2

# Part II
# Overview of Committee

## Committee Organization

| Important Dates | ARMPAC |
|---|---|
| • Date of Registration | April 22, 1994 |
| • Audit Coverage | January 1, 2001 – December 31, 2002 |
| | |
| **Headquarters** | Washington, DC |
| | |
| **Bank Information** | |
| • Bank Depositories | 2 |
| • Bank Accounts | 2 Federal and 1 Non-Federal Checking Accounts |
| | |
| **Treasurer** | |
| • Treasurer When Audit Was Conducted | Corwin Teltschik |
| • Treasurers During Period Covered by Audit | Corwin Teltschik |
| | |
| **Management Information** | |
| • Attended FEC Campaign Finance Seminar | No |
| • Used Commonly Available Campaign Management Software Package | Yes |
| • Who Handled Accounting and Recordkeeping Tasks | Paid Staff |

## Overview of Financial Activity
### (Audited Amounts)

| | |
|---|---|
| **Cash on hand @ January 1, 2001** | $  181,586 |
| o  Contributions from Individuals | 2,501,934 |
| o  Other Political Committees | 847,016 |
| o  Transfers from Non-federal Account for Joint Activity | 255,758 |
| o  Offsets to Expenditures | 16,149 |
| o  Refund of Contributions Made | 8,146 |
| o  Other Receipts | 2,278 |
| **Total Receipts** | **$3,631,281** |
| o  Operating Expenditures (including other disbursements) | 2,663,757 |
| o  Contributions to Federal Candidates/Other Political Committees | 1,046,000 |
| **Total Disbursements** | **$3,709,757** |
| **Cash on hand @ December 31, 2002** | $   103,110 |

ATTACHMENT /
Page 4 of 14


3

# Part III
# Summaries

## Findings and Recommendations

### Finding 1.  Misstatement of Financial activity
A comparison of ARMPAC's reported figures to its bank records revealed that receipts and the ending cash balance had been materially misstated for calendar year 2001 as well as beginning cash-on-hand, receipts, disbursements and ending cash-on-hand for calendar year 2002.  The Audit staff recommended that ARMPAC amend its disclosure reports to correct the misstatements.  In response to the interim audit report, ARMPAC filed amended reports that materially corrected the misstatements noted above.  (For more detail, see p. 4)

### Finding 2.  Reporting of Debts and Obligations
ARMPAC failed to report debts owed to 25 vendors in the amount of $322,306.  The Audit staff recommended that ARMPAC amend its disclosure reports to include these debts.  In response to the interim audit report, ARMPAC filed amended reports that materially disclosed the debts noted above.  (For more detail, see p. 6)

### Finding 3.  Non-federal Funding of Federal Activity
A review of expenditures made from federal and non-federal accounts indicated that the non-federal account potentially paid more than its share of allocable expenses by $211,281. Contributing significantly to this result was the allocation ratio for administrative expenses used by ARMPAC.  ARMPAC allocated 50% of its administrative expenses to the non-federal account, instead of 7%.  In addition, ARMPAC made disbursements that appear to be allocable between the federal and non-federal accounts from its non-federal account rather than from its federal account.  The Audit staff recommended that ARMPAC either demonstrate there had been no over funding by the non-federal account or reimburse the non-federal account $211,281 and correct its disclosure of the expenditures.  In response to the interim audit report, ARMPAC provided additional documentation that reduced the liability to the non-federal account to $203,483 and amended its disclosure reports to reflect these changes.  (For more detail, see p. 7)

ATTACHMENT
Page 5 OR 15

4

# Part IV
# Findings and Recommendations

## Finding 1. Misstatement of Financial Activity

### Summary

A comparison of ARMPAC's reported figures to its bank records revealed that receipts and the ending cash balance had been materially misstated for calendar year 2001 as well as beginning cash-on-hand, receipts, disbursements and ending cash-on-hand for calendar year 2002. The Audit staff recommended that ARMPAC amend its disclosure reports to correct the misstatements. In response to the interim audit report, ARMPAC filed amended reports that materially corrected the misstatements noted above.

### Legal Standard

**Contents of Reports.** Each report must disclose:

- The amount of cash on hand at the beginning and end of the reporting period;
- The total amount of receipts for the reporting period and for the calendar year;
- The total amount of disbursements for the reporting period and for the calendar year; and
- Certain transactions that require itemization on Schedule A (Itemized Receipts); Schedule B (Itemized Disbursements) or Schedule H4 (Joint Federal/Non-federal Activity Schedule).
  2 U.S.C. §§434(b)(1), (2), and(4).

### Facts and Analysis

The Audit staff reconciled reported activity to bank records for calendar years 2001 and 2002. The following charts outline the discrepancies for the beginning cash balance, receipts, disbursements and the ending cash balance for each year. Succeeding paragraphs address the reasons for the misstatements.

| 2001 Committee Activity | Reported | Bank Records | Discrepancy |
|---|---|---|---|
| Beginning Cash Balance @ January 1, 2001 | $184,999 | $181,586 | $3,413 Overstated |
| Receipts | $1,752,895 | $1,688,418 | $64,477 Overstated |
| Disbursements | $1,776,718 | $1,766,900 | $9,818 Overstated |
| Ending Cash Balance @ December 31, 2001 | $161,176 | $103,104 | $58,072 Overstated |

The $3,413 overstatement of the beginning cash balance on January 1, 2001 could not be explained.

5

The net overstatement of receipts resulted from the following:

- In-kind contribution disclosed but not included in reported totals + $ 1,661
- Reported receipts not supported by a deposit - 88,655
- Contribution amount reported incorrectly + 500
- Contributions from individuals and political committees not reported + 11,800
- Transfers from non-federal account reported incorrectly + 8,238
- Unexplained difference. + 1,979

**Total net overstatement of receipts** **$ (64,477)**

The net overstatement of disbursements resulted from the following:

- Reported disbursement paid by Non-federal account - $ 15,711
- In-kind contributions not reported + 3,180
- Unreported operating expenditures + 8,569
- Reported disbursements subsequently voided but not adjusted - 4,584
- Unexplained difference. - 1,272

**Total net overstatement of disbursements** **$ (9,818)**

As a result of the misstatements detailed above, the ending cash on hand was overstated by $58,072.

| 2002 Committee Activity | Reported | Bank Records | Discrepancy |
|---|---|---|---|
| Beginning Cash Balance @ January 1, 2002 | $161,176 | $103,104 | $58,072 Overstated |
| Receipts | $1,817,147 | $1,942,863 | $125,716 Understated |
| Disbursements | $1,902,233 | $1,942,857 | $40,624 Understated |
| Ending Cash Balance @ December 31, 2002 | $76,090 | $103,110 | $27,020 Understated |

The overstatement of the beginning cash balance on January 1, 2002, was the result of the discrepancies detailed above for 2001.

The understatement of receipts resulted from the following:

- In-kind contributions disclosed as memo and not included in reported totals + $ 750
- PAC and individual contributions not reported + 66,750
- Transfers from non-federal account reported incorrectly + 19,195
- Unexplained difference. + 39,021

**Total understatement of receipts** **$ 125,716**



6

The net understatement of disbursements resulted from the following:

- In-kind contributions not reported — + $ 750
- Unreported operating expenditures — + 43,997
- Net mathematical error overstating expenditures — - 1,000
- Voided expenditure reported in error — - 850
- Unexplained difference. — - 2,273

  **Total net understatement of disbursements** — $ 40,624

As a result of the misstatements detailed above, the ending cash on hand at December 31, 2002 was understated by $27,020.

At the exit conference, the Audit staff explained the misstatements and provided ARMPAC's representative with schedules detailing these discrepancies. The representative stated that she would review the spreadsheets provided and amend reports accordingly.

**Interim Audit Report Recommendation and Committee Response**
The Audit staff recommended that ARMPAC amend its reports to correct the misstatements noted above; and, in addition, its most recent report should be amended to show the adjusted cash-on hand balance with an explanation that it resulted from audit adjustments from a prior period. In response to the interim audit report, ARMPAC filed amended disclosure reports that materially corrected the misstatements noted above.

## Finding 2.  Reporting of Debts and Obligations

**Summary**
ARMPAC failed to report debts owed to 25 vendors in the amount of $322,306. The Audit staff recommended that ARMPAC amend its disclosure reports to include these debts. In response to the interim audit report, ARMPAC filed amended reports that materially disclosed the debts noted above.

**Legal Standard**
**A. Continuous Reporting Required.** A political committee must disclose the amount and nature of outstanding debts and obligations until those debts are extinguished. 2 U.S.C §434(b)(8) and 11 CFR §§104.3(d) and 104.11(a).

**B. Separate Schedules.** A political committee must file separate schedules for debts owed by the committee and debts owed to the committee, together with a statement explaining the circumstances and conditions under which each debt and obligation was incurred or extinguished. 11 CFR §104.11(a).

**C. Itemizing Debts and Obligations**
- A debt of $500 or less must be reported once it has been outstanding 60 days from the date incurred (the date of the transaction); the committee reports it on the next regularly scheduled report.

ATTACHMENT _1_
Page _8_ of _14_



7

- A debt exceeding $500 must be disclosed in the report that covers the date on which the debt was incurred. 11 CFR §104.11(b).

**Facts and Analysis**
Disclosure reports filed during the audit period did not disclose any debts owed by ARMPAC. The Audit staff reviewed disbursements and identified debts owed to 25 vendors, totaling $322,306, which should have been disclosed on Schedules D (Debts and Obligations excluding Loans). The majority of the debts were outstanding over several reporting periods but not reported. In order to derive the total debts not reported, each outstanding debt was counted only once, even if it was outstanding for several periods.

ARMPAC's representative was informed of this matter at the exit conference and provided a schedule detailing the debts requiring disclosure. She indicated that the amended Schedules D would be filed.

**Interim Audit Report Recommendation and Committee Response**
The Audit staff recommended that ARMPAC amend its reports to disclose the debts and obligations addressed above on Schedules D as required. In response to the interim audit report, ARMPAC filed amended reports which included Schedules D that materially disclosed these debts.

## Finding 3. Non-federal Funding of Federal Activity

**Summary**
A review of expenditures made from federal and non-federal accounts indicated that the non-federal account potentially paid more than its share of allocable expenses by $211,281. Contributing significantly to this result was the allocation ratio for administrative expenses used by ARMPAC. ARMPAC allocated 50% of its administrative expenses to the non-federal account, instead of 7%. In addition, ARMPAC made disbursements that appear to be allocable between the federal and non-federal accounts from its non-federal account rather than from its federal account. The Audit staff recommended that ARMPAC either demonstrate there had been no over funding by the non-federal account or reimburse the non-federal account $211,281 and correct its disclosure of the expenditures. In response to the interim audit report, ARMPAC provided additional documentation that reduced the liability to the non-federal account to $203,483 and amended its disclosure reports to reflect these changes.

**Legal Standard**
**A. Accounts for Federal and Non-federal Activity.** A committee that finances political activity in connection with both federal and non-federal elections must establish two accounts (federal and non-federal) and allocate shared expenses--those that simultaneously support federal and non-federal election activity—between the two accounts. Alternatively, the committee may conduct both federal and non-federal activity from one bank account, considered a federal account. 11 CFR §102.5(a)(1)(i).



**B. Federal vs. Non-federal Account.** The federal account may contain only those funds that are permissible under the federal election law; the non-federal account may contain funds that are not permitted under the federal law (but are legal under state law), such as contributions that exceed the limits of the federal law and contributions from prohibited sources, such as corporations and labor organizations. 11 CFR §102.5(a)(1)(i) and (a)(3).

**C. Reporting Allocable Expenses.** A political committee that allocates federal/non-federal expenses must report each disbursement it makes from its federal account (or separate allocation account) to pay for a shared federal/non-federal expense. Committees report these kinds of disbursements on Schedule H4 (Joint Federal/Non-federal Activity Schedule). 11 CFR §104.10(b)(4)

**D. Allocation Required for Generic Voter Drives.** Nonconnected committees must allocate all of their costs for generic voter drives. A generic voter drive is an activity that urges the general public:
- To register to vote;
- To vote; or
- To support candidates of a particular party or candidates who are associated with a particular issue, without mentioning a specific candidate. 11 CFR §106.6(b)(2)(iii).

**E. Determining the Appropriate Allocation Ratio.** Nonconnected committees shall allocate administrative expenses and costs of generic voter drives based on the ratio of federal expenditures to total federal and non-federal expenditures. The federal and non-federal expenditures used in this calculation are limited to expenditures made in direct support of candidates. 11 CFR §106.6(c)(1)

**F. Allocation Ratio for Shared Fundraising Expenses.** If a committee raises both federal and non-federal funds through the same fundraising program or event, it must allocate the direct cost of the fundraising event based upon the ratio of funds received by the federal account to the total amount raised for the event. 11 CFR §106.5(f)(1).

## Facts and Analysis

ARMPAC maintained separate federal and non-federal bank accounts. It paid shared expenses from the federal account and transferred funds from the non-federal account to the federal account to cover the non-federal share of those expenses. ARMPAC paid allocable expenses for administrative and generic get out the vote (GOTV) expenses from the federal account using a ratio of 50% federal and 50% non-federal and disclosed this ratio on its Schedules H1 (Method of Allocation for Shared Federal and Non-federal Administrative Expenses and Generic Voter Drive Costs). The Audit staff reviewed disbursements from both the federal and non-federal accounts and found that the non-federal had potentially over funded its share of allocable expenses by $211,281. The succeeding paragraphs address the issues noted by the Audit staff.



9

**A.  Incorrect Ratio Used for Administrative and Generic Get-Out-the-Vote (GOTV) Expenses**

As noted above, ARMPAC paid allocable expenses for administrative and generic get-out-the-vote expenses from the federal account using a ratio of 50% federal and 50% non-federal.  The Audit staff reviewed direct candidate support by ARMPAC in order to determine the correct allocation ratio for such expenses. ARMPAC contributed a total of $1,120,600 directly to candidates; $1,046,000 to federal candidates and $74,600 to non-federal candidates.  Based on this information, the Audit staff calculated the allocation ratio to be 93% federal ($1,046,000/$1,120,600) and 7% non-federal ($74,600/$1,120,600).  ARMPAC calculated that the non-federal share of administrative and GOTV expenses was $141,225; the Audit staff's calculation is $19,769 at 7%.  Therefore, the non-federal overpaid its portion of such allocable expenses by $121,456 ($141,225 - $19,769).

**B.  Incorrect Ratio Used for Fundraising Event Expenses**

ARMPAC paid allocable expenses for eight fundraising events from the federal account using estimated ratios of federal and non-federal receipts for each event and disclosed these ratio on Schedule H2 (Allocation Ratios).  The following schedule shows the ratio reported by ARMPAC and the ratio calculated by the Audit staff based on available records:

| Fundraising Event Ratios | | |
|---|---|---|
| **Event Name and Date** | **Reported Ratio % Federal/Non-federal** | **Audit Ratio % Federal/Non-federal** |
| Four Streams 2001 (7/23/01) | 20/80 | 17/83 |
| Puerto Rico 2001 (9/10/01) | 15/85 | 8/92 |
| Hackberry 2001 (10/24/01) | 50/50 | 40/60 |
| Orlando 2001 (11/2/01) | 15/85 | 12/88 |
| Puerto Rico 2002 (2/25/02) | 15/85 | 10/90 |
| California 2002 (3/26/02) | 20/80 | 47/53 |
| Four Streams 2002 (4/19/02) | 15/85 | 28/72 |
| New York 2002 (6/1/02) | 40/60 | 18/82 |

On Schedule H4, ARMPAC reported $126,511 as the non-federal share of expenses relative to the eight fundraising events. The Audit staff applied it's ratios to these fundraising expenses and determined the non-federal portion to be $117,097. Thus, the non-federal had overpaid its share by $9,414.

C. <u>Federal Share of Allocable Expense Made from the Non-federal Account</u>

The Audit staff's review of non-federal disbursements identified 112 payments totaling $418,352 to consulting/fundraising vendors for fundraising expenses. ARMPAC provided contracts and affidavits that describe services provided by these vendors as non-federal fundraising activity, developing strategies and objectives for the organization; implementing direct mail and telemarketing efforts; and providing guidance with respect to the committee's role in non-federal races and state party activity. Therefore, ARMPAC contends that these vendor payments were solely non-federal expenses.

Documentation provided to date does not show a separate non-federal fundraising activity. On the contrary, the fundraising ratios developed above resulted from documentation provided by ARMPAC which indicates the events were shared fundraising efforts for both the federal and non-federal accounts. Further, the Audit staff notes that some payments were made to these vendors by ARMPAC and disclosed on Schedules H4 (Joint Federal/Non-federal Activity Schedule) as shared expenses. As such, the Audit staff considers these payments to be for shared activity.

In the absence of documentation allowing the Audit staff to associate these expenses with specific fundraising events, a simple average, federal fundraising ratio was calculated based on the fundraising event ratios described above in Finding 3.B. – Incorrect Ratio used for Fundraising Event Expenses. This ratio has been applied to determine the federal portion of the expense paid from the non-federal account to be $94,129, or 22.5% of $418,352.

In addition, ARMPAC reported a $15,710 fundraising expense for a 2001 Puerto Rico event which was paid directly from the non-federal account. The Audit staff's calculated fundraising ratio for this event was 8% as described above in Finding 3.B. – Incorrect Ratio used for Fundraising Event Expenses, therefore the federal portion of this allocable expenditure was calculated to be $1,257, or 8% of $15,710.

Therefore, the non-federal had paid the federal's portion of shared expenses, which totaled $95,386 ($94,129 + $1,257).

The Audit staff presented this matter at the exit conference and provided ARMPAC's representative with schedules detailing the expenditures. The representative expressed a willingness to review the spreadsheets provided, file amended reports and understood a payment from the federal account to the non-federal account may be required.

## Interim Audit Report Recommendation and Committee Response

The Audit staff recommended that ARMPAC demonstrate the identified disbursements paid by the non-federal account are not allocable expenses by providing documentation that the fundraising was solely non-federal in nature, the Audit staff's administrative/generic get-out-the-vote and fundraising ratios as calculated above are incorrect, and/or there has been no over funding by the non-federal account. Absent such a demonstration, it was recommended that ARMPAC:

- File a Schedule H1 to correctly disclose the administrative/gotv allocation ratio;
- File a Schedule H2 to correctly disclose the fundraising event allocation ratios;
- File Schedules H4 disclosing the payments from the non-federal account as memo entries that include the total amount paid, the federal share, and the non-federal share;
- Footnote each memo entry on Schedule H4 to say "recognize payments of allocable expenses from the non-federal account"; and
- Use funds from its federal account to reimburse the non-federal account $211,281 and provide evidence of such reimbursement. If ARMPAC lacked the funds to make the reimbursement, it should have disclosed the amount owed as a debt on Schedule D until such time as funds became available to make the reimbursement.

In response to the interim audit report, ARMPAC submitted documentation and filed amended disclosure reports addressing each of the matters presented above.

With respect to Finding 3.A. above, Incorrect Ratio Used for Administrative and Generic Get-Out-the-Vote (GOTV) Expenses, ARMPAC, as part of its response, submitted an amended Schedule H1 correcting its ratio from the 50% federal/50% non-federal it had utilized to the 93% federal/7% non-federal calculated by the Audit staff. In addition, amended Schedules H4 were submitted correcting the disclosure of shared administrative/GOTV expenditures to reflect the correct ratio and decreasing the non-federal share by $121,456. The Non-Federal Funding Analysis (the Analysis) on page 12 reflects these corrections.

With respect to Finding 3.B. above, Incorrect Ratio Used for Fundraising Event Expenses, in response to the interim audit report, ARMPAC provided additional documentation detailing the receipts collected relative to each of the fundraising events. The Audit staff reviewed the documentation and revised its fundraising ratios accordingly. Based on the revised ratios, the Audit staff re-calculated the non-federal share of expenses associated with these events and determined it had overpaid by $8,205 ($126,511 originally reported - $118,306 amended reports); down from the $9,414 calculated in the interim audit report. As part of its response, ARMPAC submitted amended Schedules H2 to disclose the correct fundraising ratio for each event and amended Schedules H4 to correct the disclosure of the shared fundraising expenditures impacted by the revised ratios. The Analysis on page 12 reflects these corrections.

Finally, with respect to Finding 3.C., Federal Share of Allocable Expense Made from the Non-federal Account, based on the revised fundraising event ratios discussed above, the Audit staff calculated a revised, simple average federal fundraising ratio. This ratio has been applied to determine the federal portion of the $418,352 fundraising expenses paid

from the non-federal account to be $87,854 (21% of $418,352). ARMPAC's response did not dispute this matter, and included amended Schedules H4 (memo entries) to disclose these expenditures.

In addition, the federal portion of a $15,710 fundraising expense for a 2001 Puerto Rico event which was paid directly from the non-federal account was re-calculated using the revised fundraising ratio for this event as detailed above. The federal portion of this allocable expenditure is $943, or 6% of $15,710.

The total adjustment for the federal share of allocable expenses made from the non-federal account on the Analysis is $88,797 ($87,854 + $943).

Based on ARMPAC's response, the Audit staff prepared the Analysis that appears below.

| Non-federal Funding Analysis | | |
|---|---|---|
| **Description** | **Finding Index** | |
| Net Transfers made from Non-federal Accounts | | $ 252,761 |
| Less: Non-federal Portion of Allocable Expenditures per amended reports filed by ARMPAC on 06-24-05 in response to the interim audit report. | | (138,075)[2] |
| **Net (Under funding)/Over funding by the Non-federal Account:** | | $ 114,686 |
| **Adjustment:** | | |
| Federal Share of Allocable Expenses made from the Non-federal Account | Finding 3. C. | $ 88,797 |
| **Adjusted Amount of Non-federal OVER Funding of Allocable Expenses** | | $ 203,483 |

The Analysis indicates that the non-federal account has over funded its share of allocable expenses by $203,483. ARMPAC amended its Schedule D to reflect this as a debt owed to "Americans for a Rep. Majority NonFed Acct.".

---

[2]    This figure is the non-federal portion of allocable expenditures originally reported ($267,736) adjusted for amended reports which reduced the non-federal portion of administrative and generic get-out-to-vote expenses by $121,456 and fundraising event expenses by $8,205.

Tab E



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D C  20463

July 19, 2006

**VIA FIRST CLASS MAIL**

Donald F. McGahn II, Esq.
McGahn and Associates, PLLC
601 Pennsylvania Avenue, NW
Suite 900, South Building
Washington, DC  20004

RE:    MUR 5675
       Americans for a Republican Majority
       and Corwin Teltschik, in his official
       capacity as Treasurer

Dear Mr. McGahn:

On July 7, 2006, the Federal Election Commission accepted the signed conciliation agreement submitted on your clients' behalf in settlement of a violation of 2 U.S.C. § 434(b), a provision of the Act, and 11 C.F.R. §§ 102.5(a), 104.3(d), 104.10(b)(4), 104.11, 106.5(f) and 106.6.  Accordingly, the file has been closed in this matter.

Documents related to the case will be placed on the public record within 30 days.  *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003).  Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission.  *See* 2 U.S.C. § 437g(a)(4)(B).

Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the civil penalty is due within 30 days of the conciliation agreement's effective date.  If you have any questions, please contact me at (202) 694-1650.

Sincerely,

Lynn Y. Tran
Attorney

Enclosure
  Conciliation Agreement

RECEIVED
FCC MAIL
OPERATIONS CENTER

2006 JUN 22 P 12: 41

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL

2006 JUN 2? P 2: 21

**BEFORE THE FEDERAL ELECTION COMMISSION**

| | |
|---|---|
| In the Matter of ) | MUR 5675 |
| ) | |
| Americans for a Republican Majority ) | |
| and Corwin Teltschik, in his official ) | |
| capacity as Treasurer ) | |

**CONCILIATION AGREEMENT**

This matter originated with a complaint filed with the Federal Election Commission ("the Commission") by Citizens for Responsibility and Ethics in Washington and information ascertained by the Commission in the normal course of carrying out its supervisory responsibilities. The Commission found reason to believe that Americans for a Republican Majority ("the Committee") and Corwin Teltschik, in his official capacity as Treasurer, (collectively, "Respondents") violated 2 U.S.C. § 434(b) and 11 C.F.R. §§ 102.5(a), 104.3(d), 104.10, 104.11, 106.5(f) and 106.6.

NOW, THEREFORE, the Commission and the Respondents, having participated in informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree as follows:

I. The Commission has jurisdiction over the Respondents and the subject matter of this proceeding, and this agreement has the effect of an agreement entered pursuant to 2 U.S.C. § 437g(a)(4)(A)(i).

II. Respondents have had a reasonable opportunity to demonstrate that no action should be taken in this matter.

III. Respondents enter voluntarily into this agreement with the Commission.

IV. The pertinent facts in this matter are as follows:

Conciliation Agreement
MUR 5675 (ARMPAC)

    1.  The Committee is a political committee within the meaning of 2 U.S.C. § 431(4), and is not the authorized committee of any candidate.

    2.  Corwin Teltschik is the treasurer of the Committee and is a respondent in this matter only in his official capacity as treasurer.

    3.  The Federal Election Campaign Act of 1971, as amended ("the Act") requires treasurers of political committees to file reports of receipts and disbursements in accordance with 2 U.S.C. § 431(a). Each report shall disclose the amount of cash on hand at the beginning and end of the reporting period, the total amount of receipts for the reporting period and for the calendar year, the total amount of disbursements for the reporting period and for the calendar year and certain transactions that require itemization on individual schedules. 2 U.S.C. § 434(b).

    4.  A political committee must disclose the amount and nature of outstanding debts and obligations until those debts are extinguished. 2 U.S.C. § 434(b)(8) and 11 C.F.R. §§ 104.3(d) and 104.11(a). A political committee must file separate schedules for debts owed by the committee and debts owed to the committee, together with a statement explaining the circumstances and conditions under which each debt and obligation was incurred or extinguished. 11 C.F.R. § 104.11(a). A debt exceeding $500 must be disclosed in the report that covers the date on which the debt was incurred. 11 C.F.R. § 104.11(b).

    5.  A political committee that finances political activity in connection with both federal and non-federal elections must establish a federal and non-federal account and allocate shared expenses between those two accounts or conduct all activity from a single federal account. 11 C.F.R. § 102.5(a)(1)(i)(2002). A federal account may contain only those funds that are permissible under federal.election law while the non-federal account may contain funds that are

Conciliation Agreement
MUR 5675 (ARMPAC)

not permissible under federal law, but are legal under state law.  11 C.F.R. §§ 102.5(a)(1)(i) and

(a)(3)(2002).

     6.  A political committee that allocates shared federal and non-federal expenses must

report each disbursement it makes from its federal account or separate allocation account for

joint federal and non-federal activity.  11 C.F.R. § 104.10(b)(4).

     7.  Non-connected committees must allocate all their costs for generic voter drives.

11 C.F.R. § 106.6(b)(2)(iii).  Administrative expenses and costs of generic voter drives are

allocated between federal and non-federal accounts based on a ratio of federal expenditures to

total federal and non-federal expenditures.  The federal and non-federal expenditures used in this

calculation are limited to expenditures made in direct support of candidates.  11 C.F.R.

§ 106.6(c)(1).

     8.  During the 2001-2002 election cycle, Commission regulations[1] required that

administrative expenses and costs of generic voter drives are allocated between federal and non-

federal accounts based on a ratio of federal expenditures to total federal and non-federal

expenditures made by the committee during the two-year federal election cycle; per those

regulations, this ratio shall be estimated and reported at the beginning of each federal election

cycle, based on the committee's federal and non-federal disbursements in a prior comparable

election cycle or upon the committee's reasonable prediction of its disbursements for the coming

two years.  Per the same applicable regulations, the federal and non-federal expenditures used in

this calculation are limited to expenditures made for specific candidates.  11 C.F.R. § 106.6(c)(1)

(2002).

---

[1] The Commission adopted new regulations, effective January 1, 2005, governing the allocation of joint federal and non-federal activity, supplanting the regulations that governed the Committee during the 2001-2002 election cycle.

Conciliation Agreement
MUR 5675 (ARMPAC)

9.  A committee that raises both federal and non-federal funds through the same fundraising program or event must allocate the direct costs of the fundraising event based on the ratio of funds received by the federal account to the total amount raised for the event.  11 C.F.R. § 106.6(b)(2)(ii) and (d)(2002).

10. Pursuant to 2 U.S.C. § 438(b), the Commission audited the Committee's financial activity from January 1, 2001 through December 31, 2002.  This audit revealed that the Committee failed to properly report its financial activity as follows:

a.  The Committee failed to accurately report $74,295 in financial activity in 2001 and $166,340 in financial activity in 2002.  These figures include in-kind contributions not reported or disclosed but not included in reported totals, reported receipts not supported by deposits, contributions not reported or reported incorrectly, transfers and disbursements from the non-federal account reported incorrectly, unreported operating expenditures, reported disbursements that were not adjusted, overstated expenditures and a voided expenditure reported in error.

b.  The Committee failed to report debts and obligations to twenty-five vendors totaling $322,306.

c.  The Committee established separate federal and non-federal accounts but failed to properly allocate expenses between the accounts resulting in the non-federal account overpaying its share of allocable expenses by $203,483.  The Committee used incorrect ratios to allocate administrative and get-out-the-vote expenses and fundraising event expenses between the federal and non-federal account resulting in the non-federal account overpaying its portion of expenses for generic voter drives by $121,456 and for fundraising events by $9,414.  The non-

4

federal account overpaid $95,386 in fundraising expenses that should have been charged to the federal account.

    11. Following the audit, the Committee complied with the recommendations of the Commission's Audit Division and amended its disclosure reports to materially correct the aforementioned misstatements of its financial activities. The Committee also provided additional information reducing the overpayment of allocable expenses by the non-federal account from $211,281 to $203,483.

    12. Also pursuant to the recommendations of the Commission's Audit Division, the Committee has since reimbursed the non-federal account $111,913.19 of the $203,483.

    13. Respondents contend that its misstatements of financial activity was a small percentage of the total amount raised and spent by the Committee; specifically, in 2001, the misstatement of disbursements was less than 1% of its total disbursements; in 2002, the misstatement of disbursements was approximately 2% of its total disbursements.

    14. Respondents also contend, with respect to the items alleged to be unreported debts and obligations, that such transactions were not reportable as debts and obligations either because certain transactions constituted regularly-occurring administrative expenses, or Respondents otherwise paid for all such matters within a commercially reasonable time; further, all actual payments related to these transactions were reported in a timely manner. Nonetheless, Respondents have amended their reports to show the items as debts and obligations, consistent with 2 U.S.C. § 434(b) and 11 C.F.R. §§ 104.3(d) and 104.11.

    15. Respondents also contend that, with respect to its allocation of administrative and generic voter drive expenses, it relied in good faith upon the language of the Commission

regulation (and Commission publications), and its failure to properly allocate expenses was caused by its misunderstanding of the applicable Commission regulation.

16. Specifically, Respondents contend that with respect to its general fundraising, Respondents believed they could enter into separate contracts for its federal and non-federal fundraising; they understand now that the proper course would have been to pay its fundraising expenses either entirely out of the federal account, or on a ratio based upon the actual funds raised. See 11 C.F.R. § 106.5(f)(1)(2002).

17. Similarly, Respondents contend that it calculated its overhead ratio by including both direct and indirect non-federal candidate support in arriving at its 50% federal, 50% non-federal ratio, but now understands that the calculation of the ratio is limited to only direct non-federal candidate support. See 11 C.F.R. § 104.10(b)(4)(2002); 11 C.F.R. 106.6(b)(2)(iii)(2002); 11 C.F.R. § 106.6(c)(1)(2002). Respondents note that subsequent to the time period at issue, the Commission has changed the applicable regulation, and in so doing the Commission noted its complexity, confusion regarding the proper application of the regulation, and administrative burden of compliance.

18. Respondents further contend that due to the passage of the Bipartisan Campaign Reform Act (which became effective during the relevant two-year election cycle), the "two-year election cycle" referenced in the applicable regulation was cut short, and the Committee believed it was precluded from adjusting its ratio by way of a transfer from its federal to its non-federal account after the new law's effective date; but that once it received the interim recommendations from the Audit Division, Respondents began to implement those recommendations, and transferred funds from its federal account, and reported the difference as debt.

Conciliation Agreement
MUR 5675 (ARMPAC)

V.  The Committee has committed the following violations:

1.  The Committee violated 2 U.S.C. § 434(b) by failing to properly report its receipts, disbursements and cash on hand.

2.  The Committee violated 2 U.S.C. § 434(b) and 11 C.F.R. §§ 104.3(d) and 104.11 by failing to properly report outstanding debts and obligations.

3.  The Committee violated 11 C.F.R. §§ 102.5(a), 104.10(b)(4), 106.5(f) and 106.6 by failing to properly pay for shared federal and non-federal disbursements.

VI. Respondents will take the following actions:

1.  Respondents will pay a civil penalty to the Federal Election Commission in the amount of one hundred fifteen thousand dollars ($115,000.00) pursuant to 2 U.S.C. § 437g(a)(5)(A).

2.  Respondents will cease and desist from violating 2 U.S.C. § 434(b) and 11 C.F.R. §§ 102.5(a), 104.3(d), 104.10(b)(4), 104.11, 106.5(f) and 106.6.

3.  Respondents will amend its reports to comport with this agreement and Respondents will file a termination report with the Commission, which will be processed in accordance with the applicable provision of the Act and Commission regulations.

4.  Respondent Americans for a Republican Majority, through representations to the Commission, has indicated that it is unable to raise funds sufficient to make a complete transfer of the $91,569.81 due from the federal to the non-federal account.  The Commission regards these representations as material representations.  The Committee agrees that if it has any receipts in the amount of $5,000 or greater prior to termination, it will immediately transfer such amount to pay the debt to the non-federal account.  The Committee further agrees that it shall not

Conciliation Agreement
MUR 5675 (ARMPAC)

make any expenditures in excess of $5,000 unless and until the debt to the non-federal account

has been paid in full.

VII.  The Commission, on request of anyone filing a complaint under 2 U.S.C.

§ 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance

with this agreement.  If the Commission believes that this agreement or any requirement thereof

has been violated, it may institute a civil action for relief in the United States District Court for

the District of Columbia.

VIII.  This agreement shall become effective as of the date that all parties hereto have

executed same and the Commission has approved the entire agreement.

IX.  Respondents shall have no more than 30 days from the date this agreement becomes

effective to comply with and implement the requirements contained in this agreement and to so

notify the Commission.

X.  This Conciliation Agreement constitutes the entire agreement between the parties on

the matters raised herein, and no other statement, promise, or agreement, either written or oral,

made by either party or by agents of either party, that is not contained in this written agreement

shall be enforceable.

Conciliation Agreement
MUR 5675 (ARMPAC)

FOR THE COMMISSION:

Lawrence H. Norton
General Counsel

BY: _____        _____
     Rhonda J. Vosdingh                      Date 7/19/06
     Associate General Counsel
       for Enforcement

FOR THE RESPONDENTS:

_____        _____
                                         Date 6/20/2006

9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CORWIN TELTSCHIK, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 08-089 (HKK) |
| | : | |
| WILLIAMS & JENSEN PLLC, et al. | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

[proposed] ORDER

And now, this _____ day of _____, 2008, upon consideration of

Plaintiff's Motion to Reconsider Order Granting Donald F. McGahn's Motion To Dismiss For

Lack Of Personal Jurisdiction, Motion to Dismiss or Transfer Due to Improper Venue, and

Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted (Document

No. 23 From Southern District of Texas), and all arguments and materials submitted in support

of and in opposition to that Motion, it is ORDERED that the Motion is DENIED.

SO ORDERED.

_____
United States District Court Judge
District of Columbia

Notice to:

J. Wyndal Gordon
The Law Office of J. Wyndal Gordon, P.A.
10 North Calvert Street, Suite 930
Baltimore, MD 21202

Reginald E. McKamie
1210 Antoine Drive, Suite 1000
Houston, TX 77055

L.T. "Butch" Bradt
5151 San Felipe, Suite 1950
Houston, TX 77056

David B. Stratton
Jordan, Coyne & Safits, LLP
1100 Connecticut Ave. N.W.
Washington, DC 20036

William S. Helfand
Charles T. Jeremiah
Chamberlain, Hrdlicka, White, Williams & Martin
1200 Smith Street, Suite 1400
Houston, TX 77002

Robert K. Kelner
Joshua D. Wolson
Scott F. Gast
Covington & Burling LLP
1201 Pennsylvania Ave. N.W.
Washington, DC 20004